Rel: December 20, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2024-2025

———————————————

### CR-2022-0720

———————————————

**Thomas Robert Lane**

**v.**

**State of Alabama**

**Appeal from Mobile Circuit Court**
**(CC-05-1499.60)**

MINOR, Judge.

This appeal asks whether the Mobile Circuit Court erred in summarily dismissing Thomas Robert Lane's petition for relief under Rule 32, Ala. R. Crim. P., in which he challenged his 2016 convictions for two counts of capital murder and his resulting death sentence. We affirm.

On appeal, Lane argues (1) that the circuit court should have appointed him counsel for his postconviction proceeding; (2) that the circuit court erred in adopting the State's proposed order summarily dismissing his petition; (3) that the circuit court erred in summarily dismissing his claims that, for many reasons, his trial counsel were constitutionally ineffective during the guilt and penalty phases; and (4) that the circuit court erred in summarily dismissing his claim that the State withheld exculpatory evidence.

## FACTS AND PROCEDURAL HISTORY

On direct appeal in 2020, this Court summarized the relevant facts and procedural history of the proceedings leading to Lane's convictions and death sentence for the 2003 murder of his estranged wife Theresa Lane:

> "Lane was first brought to trial in 2006 for the murder of Theresa. See Lane v. State, 80 So. 3d 280 (Ala. Crim. App. 2010). Before that trial, the State filed a motion seeking to disqualify Lane's appointed counsel under Rule 3.7, Ala. R. Prof. Cond., which provides that, subject to limited exceptions, '[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness.' Following a hearing on the State's motion, the trial court concluded that Lane's appointed counsel would be a necessary witness for the State and thus disqualified Lane's counsel and appointed new counsel to represent Lane. Lane, 80 So. 3d at 293. Thereafter, Lane was convicted of two counts of capital

2

murder—murder made capital because it was committed during a burglary, § 13A-5-40(a)(4), [Ala. Code 1975,] and murder made capital because it was committed for pecuniary gain, § 13A-5-40(a)(7). <u>Lane</u>, 80 So. 3d at 283. The jury recommended by a vote of 8-4 that Lane be sentenced to life imprisonment without the possibility of parole, but the trial court overrode the jury's recommendation and sentenced Lane to death. <u>Id.</u> at 283-84.

"On appeal, this Court held that the trial court erred by disqualifying Lane's first appointed counsel and that 'the trial court's unjustified removal of ... Lane's counsel violated Lane's Sixth Amendment right to continued representation by his counsel of choice.' <u>Lane</u>, 80 So. 3d at 302. In addition, the Court held that 'a violation of a criminal defendant's Sixth Amendment right to counsel of choice constitutes "structural error" that cannot be harmless and that automatically requires reversal.' <u>Id.</u> Thus, the Court reversed Lane's convictions and death sentence and remanded the case for a new trial. <u>Id.</u> at 302.

"On February 29, 2016, Lane was again brought to trial on the same two charges of capital murder, i.e., capital-murder burglary, § 13A-5-40(a)(4), and capital murder for pecuniary gain, § 13A-5-40(a)(7). The evidence presented at Lane's second trial tended to establish the following facts.

"At the time of Theresa's death, Lane and Theresa had separated and were in the process of divorcing, and Theresa was living with her friend, Pelagia Wilson, in Wilson's house. At approximately 7:00 a.m. on October 12, 2003, Theresa finished her shift at the Wal-Mart discount store where she worked, and a coworker who gave Theresa a ride home testified that Theresa arrived at Wilson's house at approximately 7:30 a.m. At approximately 10:00 a.m., Wilson arrived home from work and found Theresa dead in a bathtub. Wilson testified that water was still running from the bathtub faucet when she discovered Theresa's body, that one of the

knobs controlling the volume of water was on '[a]ll the way' (R. 1414) and the other was on '[j]ust [a] little bit' (R. 1415), that Theresa's unclothed body was almost completely submerged in water, but that the water was 'going down.' (R. 1415.) Wilson turned off the water and telephoned emergency 911.

"Dr. Leszek Chrostowski, a forensic pathologist, performed an autopsy and concluded that Theresa's body reflected 'hallmark[s] of drowning.' (R. 2059.) Specifically, Dr. Chrostowski testified that he observed foam in Theresa's mouth and nose, water in Theresa's sphenoid sinuses, and petechial hemorrhaging in Theresa's eyes, which indicated that Theresa had been asphyxiated. Dr. Chrostowski also testified that he observed 'multiple bruises and contusions' on Theresa's head, shoulders, chest, arms, and legs (R. 2058), which, according to Dr. Chrostowski, 'indicate struggle.' (R. 2062.) In fact, Dr. Chrostowski testified, the injuries on Theresa's arms constituted 'blunt impact injuries which can be interpreted as defense wounds.' (R. 2069.) Dr. Chrostowski also testified that he observed subdural hemorrhaging in the 'occipital region' of Theresa's head, which, according to Dr. Chrostowski, 'indicate[d] [the] application of blunt force.' (R. 2064.) Thus, given the injuries to Theresa's head and 'the contusions by the clavicle ... at the base of the neck' (R. 2065), Dr. Chrostowski testified that it appeared Theresa 'hit the bathtub ... with the back of her head. And then she was pushed underneath.' (R. 2064.) Based on his observations, Dr. Chrostowski concluded that the cause of Theresa's death was drowning and concluded, 'without slightest doubt' (R. 2063), that the drowning was a homicide.

"Regarding the events preceding Theresa's death, the evidence tended to establish the following facts. Lane and Theresa, who was a native of the Philippines, married in 1995 after Lane 'met [Theresa] on the Internet through a mail-order bride service.' (R. 1848.) In June 2003, however, Lane and Theresa separated, and Theresa moved out of the couple's

4

mobile home and moved into Wilson's house; Lane remained in the mobile home. Shortly thereafter, Theresa contacted Ronnie Williams, an attorney, to assist Lane and Theresa in obtaining what was initially an uncontested divorce. However, disagreements subsequently arose between Lane and Theresa regarding the division of marital property, which delayed the divorce, and there was evidence indicating that Lane attempted to coerce Theresa into agreeing to divorce terms that Lane found satisfactory. Specifically, Williams testified that Theresa owned a Nissan truck at that time and that

> "'the truck was being used by Lane as a wedge or carrot, so to speak, in front of [Theresa]. If she wanted her vehicle, she signed the paperwork. That sort of thing.
>
> "'In fact, it got so bad where she would go to work, he would follow her, take the truck, leave her stranded there. Call my office, if your client wants the truck, tell her to sign the papers.'

"(R. 2011.) There was also evidence indicating that, while the divorce was pending, Lane harassed Theresa by showing up at the Wal-Mart store where she worked; that Theresa would take different routes to work 'because [she] didn't know when [Lane] might would try to follow [her]' (R. 1632); that Lane left a threatening voicemail on Theresa's cellular telephone; and that, approximately one week before Theresa was murdered, Lane went to Wilson's house and knocked on the door but that Wilson and Theresa would not open the door because they were 'scared.' (R. 1411.)

> "Evidence also indicated that Lane was desperate to have the divorce finalized quickly and that, in an effort to expedite the divorce, he repeatedly contacted Williams to express frustration with the fact that the divorce was being delayed and to urge Williams to prioritize the finalization of

5

the divorce. As to the reason Lane wanted the divorce finalized quickly, Williams testified:

> " 'Well, a couple of times I had conversations with [Lane]. But on one particular occasion he had a photo. He was trying to explain to me why he was in such a great rush to get this matter over with. And he had a photo of a relatively young lady. I thought extremely young. But, at any rate, a young lady that was also from the Philippines. And he was trying to get her to travel here to the United States. And there was some—some issue he had on timing. That if he didn't do something by a certain period of time it would cost him much more money or something adverse was going to occur. So he was trying to explain to me that he was trying to rush this matter through in order to get this individual here. This was supposedly his new bride.'

"(R. 2022-23.) Despite Lane's efforts to have the divorce finalized quickly, Theresa refused to agree to the terms Lane proposed, so in September 2003, Williams filed on Theresa's behalf a complaint for divorce, a motion for a temporary restraining order, and an instanter motion for the return of Theresa's truck. A hearing on Theresa's instanter motion was scheduled for October 15, 2003, but the trial of Lane and Theresa's divorce action was not scheduled to occur until January 7, 2004.

"On October 3, 2003, despite the fact that Lane and Theresa's divorce was not yet finalized, Lane filed with the United States Immigration Services a petition for alien fiancée in which he identified Lorna Abe, a native of the Philippines, as his fiancée. Evidence at trial established that a person petitioning for an alien fiancée must disclose the petitioner's and fiancée's prior marriages and must provide certified proof of the legal dissolution of those marriages.

6

Although Lane's petition disclosed Lane and Theresa's marriage, Lane could not provide a judgment of divorce because no such judgment existed. Nevertheless, Lane included with his petition a 'certificate of divorce' (C. 880) that purportedly acknowledged Lane and Theresa's divorce, but that certificate was neither dated nor signed by the Mobile County circuit clerk. Thus, the United States Immigration Services sent Lane a request seeking proof of the divorce.

"There was testimony indicating that, while Lane and Theresa were separated, Lane informed his friends and neighbors that he was making arrangements to marry Abe and that he was frustrated with the delay in finalizing his and Theresa's divorce. Tony Bazzel, who was a friend of Lane's in 2003, testified that Lane visited him approximately one week before Theresa was murdered and that Lane was 'unusually upset about ... the divorce' that day because Theresa 'was trying to slow [the divorce] down' and because Lane 'had another girl in the Philippines he wanted to bring over here and he wanted to process the papers.' (R. 1693.) Bazzel further testified:

"'Q. Did he say anything else to you that you felt was unusual?

"'A. Yeah. He said he would kill [Theresa] if he thought he could get away with it.

"'....

"'Q. Did he say anything else about that?

"'A. Well, he said he'd put three bullets in her head ... if he thought he could get away with it.

"'....

"'Q. Did he say anything else to you at any

7

other time about killing [Theresa]?

"'....

"'A. Well, one day we were sitting at the house. [Lane] used to come over often. Often. And we were watching a true detective story about a man who had three Filipino brides and he murdered every one of them. The last one, he drown[ed].

"'So [Lane] looks at me. When they start talking about the insurance money, he looks at me and mentions that Theresa had insurance money. And I said something to the effect what are you planning on doing, ... put a bomb in her car. He goes, no, I thought I'd just run her off the road or something like that.'

"(R. 1694-95.)

"John Marshall Bowers and his wife, who were Lane's neighbors in 2003, both testified that, in the week preceding Theresa's death, Lane showed them a photograph of a 'young girl that he'd done bought and paid for from the Philippines' (R. 1328) who 'was going to be his new wife.' (R. 1685.) Bowers testified that he asked Lane if Lane did not 'think [he] need[ed] to get divorced first,' but, according to Bowers, Lane replied: 'I'm not going to have to worry about that for long.' (R. 1685.) Scott Bruno and Melissa Guthrie, who were also Lane's neighbors in 2003, testified that, the day before Theresa was murdered, Lane came to their home and asked them if they 'would be able to watch ... his dog while he went ... to pick up his new bride from the Philippines.' (R. 1340.) Bruno and Guthrie also testified that Lane showed them a picture of his 'new bride' and that he told them 'he had already made plans and had his passport and tickets and everything for her.' (R. 1341.) However, according to Bruno, Lane stated that he

would not be able to travel to the Philippines immediately because his 'new bride' 'was not of age,' and 'there was some kind of financial thing. He had to pay the father of the new ... bride.' (R. 2001.) Rather, Bruno testified, Lane stated that 'he had to be [in the Philippines] in December' (R. 2000), despite the fact that the trial of Lane and Theresa's divorce action was not scheduled until January.

"Bruno and Guthrie both testified that, as they were leaving for church at approximately 8:15 a.m. the following day—the day Theresa was murdered—Lane emerged from his mobile home and told them that he was going to buy coffee and doughnuts. According to both Bruno and Guthrie, Lane left in his green truck, which Guthrie identified in a photograph admitted into evidence at trial. Bruno and Guthrie also both testified that they returned home from church at approximately 9:30 a.m. and that Lane's truck was parked in front of his mobile home at that time. Evidence indicated that a round-trip drive from Lane's mobile home to Wilson's house took approximately 30 minutes. (R. 1962.)

"The trial court allowed the State to read into evidence James Jay's testimony from Lane's first trial because Jay had died before Lane's second trial. In 2003, Jay and Wilson lived on the same street, and Jay testified that, at approximately 8:30 a.m. on the day Theresa was murdered—15 minutes after Bruno and Guthrie saw Lane leave his mobile home—Jay was '[s]tanding at [his] kitchen window looking out' when he saw a green truck 'pull[] over [onto Jay's] side of the property and park[].' (R. 1353.) When shown the photograph of Lane's truck that Guthrie had identified, Jay testified that the truck he saw on his property that morning 'looked just like that.' (R. 1354.) According to Jay, the driver of the truck exited the truck, crossed the street, and walked onto Wilson's front porch. However, Jay testified that he could not see whether the driver entered Wilson's house because, once the driver reached the front porch, Jay's view was obscured by shrubbery. According to Jay, the driver '[d]idn't look like no

9

big man' (R. 1362) and was '[a]bout [Jay's] size' (R. 1355) (Jay was 5'5" and weighed 120 pounds), but evidence indicated that, at the time of Theresa's death, Lane was 5'10" and weighed 275 pounds. However, Jay also testified that there was a distance of approximately 115 feet between where he was standing at his kitchen window and where Lane's truck was parked.

"As noted, Wilson discovered Theresa's body at approximately 10:00 a.m.—90 minutes after Jay saw near Wilson's house the truck identified as Lane's. Law enforcement officers with the Mobile County Sheriff's Department responded to Wilson's 911 call and testified regarding their observations at the scene of the murder. Deputy Eric Leddick testified that Theresa was in the bathtub with 'the shower curtain ... pulled down on top of [her]' (R. 1452), that Theresa was 'completely submerged underwater' (R. 1451), that the water level in the bathtub was 'about three-quarters of the way up the [overflow drain]' (R. 1451), that he 'could hear the water leaving the tub' (R. 1450), and that he assumed the water was draining through the overflow drain. (R. 1460.) Detective Shane Stringer also testified that '[t]he water level was above [Theresa's] face and ... was over the little [overflow] drain piece on the tub' (R. 1477) and that he 'could hear water draining, which [he] believed to be [draining through] the little [overflow] drain.' (R. 1478.) Detective Lark Collins, however, testified that water was also draining through the primary drain in the bottom of the bathtub but that Theresa's 'hair was shutting it off some, her hair being caught in it.' (R. 1571.) In addition, Det. Stringer testified that 'there had been ... a bowl with assorted stuff on top of the commode that was laying [sic] in the floor kind of scattered about between the commode and the bathroom.' (R. 1476.) According to Det. Stringer, '[w]ith the bent shower curtain and the stuff on the floor, it appeared that there had been a struggle.' (R. 1477.)

"Mitch McRae, a detective with the Mobile County

10

Sheriff's Department, responded to the scene at approximately 1:00 p.m., by which time Theresa's body had been removed from the bathtub. According to Det. McRae, Det. Collins 'labeled [Theresa's death] suspicious,' but Dr. Chrostowski 'had just mentioned on his way out ... that [Theresa's death] was probably medical, either a seizure or an aneurysm of some type.'[3] (R. 1842.) Thus, Det. McRae testified, he left the scene and 'was going to try to find [Lane] and do a death notification' and 'get a medical history on Theresa.' (R. 1843.) According to Det. McRae, he was 'talking about [the need to locate Lane] over dispatch, so every deputy in Mobile County heard it' (R. 1843) and 'understood that we were looking for [Lane's truck].' (R. 1843-44.) However, Det. McRae testified that, before anyone located Lane, Lane telephoned him and 'said that he had heard his wife had passed away' and 'asked a few questions' (R. 1844), so Det. McRae arranged to meet Lane at Det. McRae's office. According to Det. McRae, he was waiting on Lane to arrive when Deputy Leddick, who by that time had left Wilson's house and was on patrol, notified him that he was following Lane's truck and asked if the truck 'need[ed] to be stopped.' (R. 1844.) Det. McRae testified that he instructed Deputy Leddick to 'pull [Lane] over' and that he told Deputy Leddick he would 'meet [him] there.' (R. 1844.)

"Regarding what occurred after he initiated the traffic stop, Deputy Leddick testified:

"'Before I could even finish getting out of my patrol car, [Lane] got out of [his] truck and began coming back to mine. I ordered him several times to stop. And he asked several times what's wrong with my wife, what happened to my wife.

"'I never mentioned anything about his wife or why I was pulling him over.

"'....

11

"'I asked him several times to place his hands on the truck because, at that time, he started making me nervous. He kept fidgeting around, kept fidgeting around. And he asked me— he said I don't even know where my wife lived. Where did she live?

"'Still, I never said anything about his wife.

"'At that time, I placed him in handcuffs and detained him by the back of the truck until Det. McRae arrived.'

"(R. 1457-58.) There is no indication or allegation that Deputy Leddick searched Lane's person or Lane's truck while waiting on Det. McRae to arrive, but Deputy Leddick did testify that he observed 'a wet ... bath towel' in the passenger's cab of Lane's truck. (R. 1458.) David Phillips, an investigator with the Mobile County Sheriff's Department, also responded to the scene of the traffic stop and observed that Lane, who was wearing shorts, 'had some scratch marks on the bottom of his right leg.' (R. 1500.)

"Approximately 15 to 20 minutes after Deputy Leddick initiated the traffic stop, Det. McRae arrived at the scene. At that time, Lane was standing near the rear of his truck and was still handcuffed. Det. McRae testified that he 'immediately took the handcuffs off' Lane and that he asked Deputy Leddick 'if everything was okay,' and, according to Det. McRae, Deputy Leddick stated that Lane 'was just acting a little weird so [he] went ahead and cuffed [Lane].' (R. 1845.) Det. McRae testified that, after he uncuffed Lane, he 'invited [Lane] to the front seat of [Det. McRae's] car, and [they] sat down in the car.' (R. 1845.) According to Det. McRae, Lane was not under arrest at that time, but Det. McRae 'went ahead and read [Lane] his <u>Miranda</u>[4] rights just out of caution' (R. 1846), and Lane signed a form waiving those

12

rights and agreed to speak with Det. McRae.

"Det. McRae testified that Lane provided him with general background information regarding Lane and Theresa's marriage, their pending divorce, and Theresa's medical history, and Det. McRae also testified that Lane 'admitted ... that he had met another woman from the Philippines ... and [was] interested in her and ha[d] been corresponding with her through the Internet.' (R. 1850.) Regarding Lane's recent contact with Theresa, Det. McRae testified that Lane stated he 'hadn't seen or heard from [Theresa] in over three weeks' (R. 1850) and that he '[s]everal times ... repeated that he [did not] know where [Theresa] was living.' (R. 1851.) However, as noted, Wilson testified that Lane had been to her house approximately one week before Theresa was murdered. Lane's statement was also inconsistent with other evidence presented at trial in that, although Lane's neighbors testified that Lane had left his mobile home at approximately 8:15 a.m. that day, Det. McRae testified that Lane claimed he had not awakened until 9:00 a.m. and that he had not left his mobile home until sometime between 11:00 and 11:30 a.m. Specifically, Det. McRae testified:

"'Q. Okay. Did [Lane] say what he had done that morning?

"'A. Yeah. I asked him about how his day started. He said he woke up at about 9 o'clock. He stayed in his residence until 11 o'clock where he emailed his friend in the Philippines until approximately 11:30, at which time he left to go visit friends at Green Park trailer park off of Airport Boulevard.

"'Q. And who did you later determine lived there?

13

"'A. That would be Bing and Tony Bazzel.

"'Q. Okay. And what did he say he did at the Bazzels'?

"'A. He said once he arrived at his friends' house, he went for a walk alone for approximately one hour where he stopped and purchased some items at a garage sale.

"'When he returned to his friends' house, Lane overheard—he overheard a conversation on the phone with Bing. He saw that Bing became upset and he questioned her what was wrong. Bing refused to tell him, so he left in his vehicle and called a friend.

"'Q. Okay. Who did he call?

"'A. Willie Silver.

"'Q. And what did Willie—what did he say Willie told him?

"'A. Willie told him that Theresa had been found in a bathtub dead, at which time Lane returned back to Bing's house to question her.

"'Q. Okay. And so did Bing tell him anything?

"'A. Bing confirmed that Theresa was dead but would not tell him any further information. That was it.

"'Q. All right. And after you took this statement, did you let Tom Lane go?

14

"'A. Yes.'

"(R. 1852-53.) Bazzel corroborated Lane's statement that Lane had visited the Bazzels on the morning Theresa was murdered. According to Bazzel, Lane came to the Bazzels' home at approximately 10:00 a.m. and appeared 'a little nervous' and 'just want[ed] to walk around,' so Lane 'went for a walk in the parking lot.' (R. 1696.) Bazzel also corroborated Lane's statement that, after Lane returned from the walk, Bazzel's wife received a telephone call that upset her and that Lane 'got fidgety' (R. 1697) when he realized that Theresa was the subject of the call.

"Evidence indicated that Theresa had a $150,000 life-insurance policy through her employer, Wal-Mart. Ronald Pierce, a chaplain with the Mobile County Sheriff's Department, testified that he received a telephone call from Lane on the afternoon Theresa was murdered and that Lane asked if Pierce knew Theresa was dead, if Pierce had been to Wilson's house, if Pierce had observed 'anything out of place' in the house, and if Pierce 'kn[e]w what was the cause of [Theresa's] death.' (R. 1802.) Pierce testified that he told Lane he had been to Wilson's house but that he also told Lane he did not know if anything was 'out of place' or what caused Theresa's death. According to Pierce, Lane then asked 'if there was some way [Pierce] could help [Lane] get the papers to get the insurance from Wal-Mart, the life insurance.' (R. 1803.) Pierce testified that he told Lane he did not know how to collect the life-insurance proceeds but that he 'would check and see if there was some way that [he] could do something to help.' (R. 1803.) However, evidence indicated that, rather than waiting on Pierce's assistance, Lane went later that day to the Wal-Mart store where Theresa worked and inquired about collecting the proceeds of Theresa's life-insurance policy. Unbeknownst to Lane, however, approximately three months earlier Theresa had changed the beneficiary of the policy from Lane to her sister, and Deborah Gabel, the human-resources manager at Wal-Mart, informed Lane that he was not the

15

beneficiary of Theresa's policy. According to Gabel, Lane's demeanor was 'fine until [she] told him that he wasn't the beneficiary,' at which point, Gabel testified, Lane 'became irate.' (R. 2096.)

"Testimony from Lane's neighbors indicated that, on the day Theresa was murdered, Lane attempted to establish an alibi. Bowers testified that Lane came to his home that night and testified as follows regarding his conversation with Lane at that time:

"'Q. What did [Lane] say that night when he came over and told you that his wife was dead?

"'A. .... [Lane] told me that ... Theresa was dead. And then he had asked me ... if I had seen him that day. That was his first thing. He asked me had I seen him that day and I said no. And then he told me that Theresa had died.

"'Q. Okay. Did he tell you how she died?

"'A. He said ... she either had an aneurysm or was held under water and drown[ed].

"'Q. And describe how [Lane] was acting when he said that his wife was dead.

"'A. Pretty much as he always did. It just ... wasn't any concern or care. There was no shock.

"'Q. After you told [Lane] that you didn't see him that day, did he say anything else or ask you anything else?

"'A. Yes, ma'am. He asked me to ... say that I saw him that morning. And I told him, no, I'm not going to do that because I'm not going to lie for

16

you or anybody else.

"'Q. Okay. And did he say why he wanted you to lie for him?

"'A. He said that he would probably be the first person that they looked into to her death.'

"(R. 1686-87.) Bruno and Guthrie also testified that Lane came to their home on the day Theresa was murdered and informed them of Theresa's death. According to Guthrie, Lane 'was a little nervous' (R. 1345) and 'reiterate[d] about, you know, [he] did go and get the coffee and donuts. Remember?' (R. 1346.) Guthrie testified that Lane 'mention[ed] that ... he was acting that way because he thought maybe a family member ... would have accused him or thought that he had done it.' (R. 1349.) Susan Hodges was also Lane's neighbor in October 2003 but testified that she had never spoken with Lane until the day Theresa was murdered. However, despite the fact that she and Lane had never met, Hodges testified that Lane came to her home on the day Theresa was murdered and informed her that Theresa had died. According to Hodges, Lane then asked her if she had seen him earlier that morning, and she replied that she had not. As to what occurred next, Hodges testified:

"'Q. And what happened then?

"'A. He said he had left that morning and went to the corner store and got some donuts and ... he said I came straight back. And I have a half box of doughnuts left over here if y'all would like them and I said no thanks.

"'Q. And did you ask him why he was asking you that?

"'....

17

"'A. He said that he was probably going to need an alibi because they usually go after the husband first.'

"(R. 1734-35.)

"The day after Theresa's death, Det. McRae went to the Alabama Department of Forensic Sciences to be present during the autopsy in which Dr. Chrostowski concluded that Theresa's death was a homicide. Det. McRae testified that he then began interviewing 'a lot of people,' including Lane's neighbors, Wilson, the Bazzels, 'people from Wal-Mart,' and Jay, who had seen Lane's truck near Wilson's house on the morning Theresa was murdered, and Lane was arrested later that afternoon. (R. 1857.)

"On October 15, 2003, Det. McRae obtained a search warrant to search Lane's mobile home and truck and seized, among other items, a chisel from Lane's truck. Scott Milroy, who was admitted as an expert in the field of 'firearms and toolmarks examiner' (R. 1594), examined the chisel found in Lane's truck and testified that the 'several grooves, valleys, nicks ... within the blade of th[e] chisel ... gives it a very unique quality' (R. 1599) and that, as a result, it 'would be hard to duplicate [that] chisel.' (R. 1617.) Milroy also examined Wilson's front door and determined that there were 'impressed toolmark[s]' (R. 1609) on the door that had been created by someone who used a tool to 'g[e]t underneath th[e] moulding and press[] on that wooden door.' (R. 1617.) After comparing the unique characteristics of the chisel found in Lane's truck with the nature of the toolmarks on Wilson's front door, Milroy concluded that 'there's not another chisel in the world' that could have created the marks on Wilson's front door. (R. 1617.) The day after Theresa was murdered, law enforcement officers recovered in the front yard of Wilson's house 'a piece of wood that was later determined to have come off the front door.' (R. 1933.)

18

"Det. McRae also recovered a computer that had been removed from Lane's mobile home before the search of the home.[5] An analysis of the hard drive of that computer indicated that, at 9:45 a.m. on the day Theresa was murdered, the background on the computer monitor had been changed from a photograph of Lane and Theresa to a pornographic photograph of Abe lying on her back with her breasts and genitals exposed, and the photograph of Abe was admitted into evidence.

"As a result of his investigation, Det. McRae also learned that an employee at a gas station located 'probably a quarter of a mile' (R. 1877) from Lane's mobile home had reported that Lane came into the gas station sometime between 8:00 a.m. and 11:00 a.m. on the day Theresa was murdered. However, Det. McRae testified that he reviewed video surveillance of the gas station that had been recorded between 7:30 a.m. and 12:00 p.m. that day and that Lane 'was not in that store.' (R. 1880.)

"Wayne Dueitt, who at the time of trial was an inmate in the Mobile County Metro Jail, testified that he was Lane's cellmate in October 2003 and that Lane confessed to him that 'he drown[ed] his wife in the bathtub' (R. 1814) and that he had 'used a screwdriver' to gain entry into Wilson's house. (R. 1814.) Dueitt also testified that Lane told him Theresa had 'struggled and she scratched his legs up' and that he had 'seen the scratches on [Lane's] legs.' (R. 1816.) Bruno, who, as noted, was Lane's neighbor in October 2003, was also subsequently incarcerated with Lane and also testified that Lane confessed to murdering Theresa. Specifically, Bruno testified that, while he and Lane were discussing Lane's case, Lane 'mentioned to [Bruno] that ... he had told a few people in ... the chapel, church, that he did it. But he wasn't too concerned ... about it because it was in the sanctity of the church and they couldn't use it against him.' (R. 2006.)

19

"In addition to allowing the State to read into evidence a transcript of Jay's testimony from Lane's first trial, the trial court also allowed the State to read into evidence the testimony of four other witnesses who testified at Lane's first trial but who were unavailable at Lane's second trial—Lane's father, Aubrey Mixon, John LaPointe, and Iris Raley.[6] Lane's father testified that, approximately three weeks before Theresa was murdered, Lane visited him in North Carolina and that, during that visit, Lane stated: '[I]f I thought I could do what Peterson[7] did and get away with it, I'd kill [Theresa].' (R. 1287.) Mixon testified that, in August 2003, he was employed at a Nissan automobile dealership in Mobile and that Lane came to the dealership and 'wanted to know where to put a repossession car because he was turning in his wife's car.' (R. 1296.) According to Mixon, he stated to Lane that 'you can't live with [women] and you can't live without them' (R. 1296), to which Lane replied: '[T]he only good woman is a dead one.' (R. 1297.) LaPointe testified that he was a private investigator, that Lane contacted him in July 2003 and told him that Lane and Theresa 'were separated and ... were in the middle of a divorce' (R. 1677), and that Lane wanted him 'to find out where [Theresa] was, follow her.' (R. 1677.) However, LaPointe testified that he declined Lane's request because '[t]here was too much emotion,' and he 'felt it would have been best not to get involved in that case.' (R. 1678.)

"Raley, Wilson's stepdaughter, testified that Wilson telephoned her after discovering Theresa's body and that she immediately went to Wilson's house. Raley testified that she remained with Wilson until law enforcement officers left, at which point Raley and Wilson also left. Raley testified that, before leaving, she locked the locking mechanism on the doorknob of the front door, and, according to Raley, the chain lock on the front door was 'always' locked (R. 1373) because '[w]e always went in and out the back door, kept the front door locked.' (R. 1370.) According to Raley, she and Wilson returned to the house with detectives the following day and entered the house through the back door. Regarding what she

20

observed upon entering Wilson's house that day, Raley testified:

> "'When I was sitting in the living room, I was just looking around and I looked up at the [front] door. And, of course, being very familiar with the home, going through there almost every day of my life, we always kept a chain on top of the door. And I noticed that the chain was off and the side plate, part of it was missing. It was broken.'

"(R. 1369.) Raley further testified that 'the chain ... looked ... a little splintery in places, like ... an object had ... fooled with it or something. It didn't look normal.' (R. 1372.)

"At the close of evidence, the jury convicted Lane of capital murder-burglary, § 13A-5-40(a)(4), and capital murder for pecuniary gain, § 13A-5-40(a)(7). … [A]t the sentencing hearing the jury recommended by a vote of 11-1 that Lane be sentenced to death, and the trial court followed the jury's recommendation and sentenced Lane to death.

"_____

"[3]As noted, Dr. Chrostowski ultimately concluded that Theresa's death was a homicide after he conducted the autopsy.

"[4]Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

"[5]At Lane's first trial, there was evidence indicating that, the day after Theresa was murdered, Lane's divorce attorney, Buzz Jordan, had instructed Lane to bring the computer to Jordan's office and that law enforcement officers had subsequently obtained the computer from Jordan. See Lane, 80 So. 3d at 288. No such evidence was presented at Lane's second trial, however. Rather, Det. McRae merely

21

testified that the computer 'was missing' (R. 1875) when Lane's mobile home was searched but that '[l]ater on we were able to recover it.' (R. 1876.)

"[6]Lane's father was unavailable by virtue of his lack of memory and multiple medical conditions that prevented him from traveling to Mobile from his home in North Carolina. Mixon and LaPointe were deceased by the time of Lane's second trial. Neither the record nor the parties' briefs clarify why Raley was unavailable, although it appears Raley might also have been deceased (R. 217), but Lane conceded at trial and concedes on appeal that Raley was unavailable. (C. 562-63; Lane's brief, at 13.)

"[7]In 2004, Scott Peterson was convicted for murdering his pregnant wife and was sentenced to death, and the case generated widespread publicity."

Lane v. State, 327 So. 3d 691, 702-12 (Ala. Crim. App. 2020).

At the penalty phase, the jury recommended, by an 11-1 vote, a death sentence. The circuit court followed the jury's recommendation and sentenced Lane to death. The circuit court found that two aggravating circumstances existed: that Lane committed the offense while engaged in the commission of a burglary, § 13A-5-49(4), Ala. Code 1975, and that Lane committed the offense for pecuniary gain, § 13A-5-49(6), Ala. Code 1975. (Trial C. 94-95.)[1] The circuit court found that two statutory

---

[1]"Trial C." refers to the clerk's record in Lane's direct appeal from his 2016 trial; "Trial R." refers to the reporter's transcript in the direct appeal. See Rule 28(g), Ala. R. App. P. See also Hull v. State, 607 So. 2d

mitigating circumstances existed: that Lane had no significant criminal history, § 13A-5-51(1), Ala. Code 1975, and that Lane was under extreme mental or emotional disturbance, § 13A-5-51(2), Ala. Code 1975. (Trial C. 97.) The circuit court found and considered, as a nonstatutory mitigating circumstance, evidence about Lane's childhood problems. (Trial C. 100.)

This Court affirmed Lane's convictions and death sentence. Lane, 327 So. 3d 691. The Alabama Supreme Court denied certiorari review. Ex parte Lane (No. 1191036, Nov. 20, 2020), cert. denied Lane v. Alabama, 142 S. Ct. 126 (2021). This Court issued a certificate of judgment on November 20, 2020, making Lane's convictions and death sentence final.

On November 16, 2021, Lane timely filed a postconviction petition under Rule 32, Ala. R. Crim. P., challenging his convictions and sentence.[2] (C. 93.) Lane also moved for the appointment of counsel. (C.

---

369, 371 n.1 (Ala. Crim. App. 1992) (noting that this Court may take judicial notice of its own records).

[2]Although he paid the filing fee on November 16, 2021, he requested a waiver of the fee the next day. (C. 5, 95.) See Rule 32.6(a), Ala. R. Crim. P. ("A proceeding under this rule is commenced by filing a petition, verified by the petitioner or the petitioner's attorney, with the clerk of the

99.)   On April 5, 2022, the State responded to the petition and moved to summarily dismiss it. (C. 134.) On April 18, 2022, the circuit court summarily dismissed the petition. (C. 276.) Lane, through counsel, moved for reconsideration and timely appealed.[3] (C. 313, 348.)

## STANDARD OF REVIEW

"'[Lane] has the burden of pleading and proving his claims. As Rule 32.3, Ala. R. Crim. P., provides:

"'"The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence."

"'"The standard of review this Court uses in evaluating the rulings made by the trial court [in

___

court. … [The petition] shall also be accompanied by the filing fee prescribed by law or rule in civil cases in the circuit court unless the petitioner applies for and is given leave to prosecute the petition in forma pauperis.").

[3]The circuit court did not rule on the motion for reconsideration before it lost jurisdiction to modify its judgment dismissing the petition. Thus, the motion was denied by operation of law. <u>Matthews v. State</u>, 363 So. 3d 1028, 1031 (Ala. Crim. App. 2021).

24

a postconviction proceeding] is whether the trial court abused its discretion." <u>Hunt v. State</u>, 940 So. 2d 1041, 1049 (Ala. Crim. App. 2005). However, "when the facts are undisputed and an appellate court is presented with pure questions of law, [our] review in a Rule 32 proceeding is de novo." <u>Ex parte White</u>, 792 So. 2d 1097, 1098 (Ala. 2001). "[W]e may affirm a circuit court's ruling on a postconviction petition if it is correct for any reason." <u>Smith v. State</u>, [122] So. 3d [224], [227] (Ala. Crim. App. 2011).

"'... [Some] of the claims raised by [Lane] were summarily dismissed based on defects in the pleadings .... When discussing the pleading requirements for postconviction petitions, we have stated:

"'"The burden of pleading under Rule 32.3 and Rule 32.6(b) is a heavy one. Conclusions unsupported by specific facts will not satisfy the requirements of Rule 32.3 and Rule 32.6(b). The full factual basis for the claim must be included in the petition itself. If, assuming every factual allegation in a Rule 32 petition to be true, a court cannot determine whether the petitioner is entitled to relief, the petitioner has not satisfied the burden of pleading under Rule 32.3 and Rule 32.6(b). <u>See</u> <u>Bracknell v. State</u>, 883 So. 2d 724 (Ala. Crim. App. 2003)."

"'<u>Hyde v. State</u>, 950 So. 2d 344, 356 (Ala. Crim. App. 2006).

"'"'Rule 32.6(b) requires that the

25

petition itself disclose the facts relied upon in seeking relief.' Boyd v. State, 746 So. 2d 364, 406 (Ala. Crim. App. 1999). In other words, it is not the pleading of a conclusion 'which, if true, entitle[s] the petitioner to relief.' Lancaster v. State, 638 So. 2d 1370, 1373 (Ala. Crim. App. 1993) [, overruled on other grounds by Robey v. State, 950 So. 2d 1235 (Ala. Crim. App. 2006)]. It is the allegation of facts in pleading which, if true, entitle a petitioner to relief. After facts are pleaded, which, if true, entitle the petitioner to relief, the petitioner is then entitled to an opportunity, as provided in Rule 32.9, Ala. R. Crim. P., to present evidence proving those alleged facts."

"'Boyd v. State, 913 So. 2d 1113, 1125 (Ala. Crim. App. 2003). "[T]he procedural bars of Rule 32[.2, Ala. R. Crim. P.,] apply with equal force to all cases, including those in which the death penalty has been imposed." Burgess v. State, 962 So. 2d 272, 277 (Ala. Crim. App. 2005).

"'Some of [Lane's] claims were also dismissed based on his failure to comply with Rule 32.7(d), Ala. R. Crim. P. In discussing the application of this rule we have stated:

"'"[A] circuit court may, in some circumstances, summarily dismiss a postconviction petition based on the merits of the claims raised therein. Rule 32.7(d), Ala. R. Crim. P., provides:

26

"'""'If the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or grant leave to file an amended petition. Leave to amend shall be freely granted. Otherwise, the court shall direct that the proceedings continue and set a date for hearing.'

"'""'"Where a simple reading of the petition for post-conviction relief shows that, assuming every allegation of the petition to be true, it is obviously <u>without merit</u> or is precluded, the circuit court [may] summarily dismiss that petition."' <u>Bishop v. State</u>, 608 So. 2d 345, 347-48 (Ala. 1992) (emphasis added) (quoting <u>Bishop v. State</u>, 592 So. 2d 664, 667 (Ala. Crim. App. 1991) (Bowen, J., dissenting)). <u>See also Hodges v. State</u>, 147 So. 3d 916, 934 (Ala. Crim. App. 2007) (a postconviction claim is 'due to be summarily dismissed [when] it is meritless on its face')[, <u>rev'd on other grounds</u>, <u>Ex parte Hodges</u>, 147 So. 3d

27

973 (Ala. 2011)]."

"'Bryant v. State, 181 So. 3d 1087, 1102 (Ala. Crim. App. 2011).'

"Washington v. State, 95 So. 3d 26, 38–39 (Ala. Crim. App. 2012).

"....

"Finally, '[a]lthough on direct appeal we reviewed [Lane's] capital-murder conviction for plain error, the plain-error standard of review does not apply when an appellate court is reviewing the denial of a postconviction petition attacking a death sentence.'[4] James v. State, 61 So. 3d 357, 362 (Ala. Crim. App. 2010) (citing Ex parte Dobyne, 805 So. 2d 763 (Ala. 2001)). With these principles in mind, we review the claims raised by [Lane] on appeal."

Marshall v. State, 182 So. 3d 573, 580-82 (Ala. Crim. App. 2014).

## DISCUSSION

On appeal, Lane argues that the circuit court erred in summarily dismissing his petition. We address his arguments in turn.

## I. MOTION FOR APPOINTED COUNSEL

Lane argues that the circuit court erred when it did not appoint counsel to represent him in his Rule 32 proceedings. Lane asserts that,

---

[4]Effective January 12, 2023, Rule 45, Ala. R. App. P., no longer requires this Court to conduct plain-error review in cases involving the death penalty.

within days of the State's submitting its answer and a proposed order,

> "the circuit court judge, who did not preside over the trial, took the unprecedented step in a death penalty case in Alabama of refusing to appoint counsel pursuant to Rule 32.7(c) to respond to the State's motion, or to even rule on Mr. Lane's motion for counsel, before adopting the State's proposed order in its entirety. The lower court did this without holding any hearing or giving Mr. Lane notice or opportunity to rebut the State's arguments or to amend the petition to remedy any purported deficiencies."

(Lane's brief, pp. 13-14.)

With one exception not applicable here,[5] there is no automatic right to counsel during postconviction proceedings:

> "'The United States Supreme Court has made it clear that neither the Eighth Amendment nor the Due Process Clause of the United States Constitution requires states to appoint counsel for inmates, including death-row inmates, who seek post-conviction relief in state courts.' Ex parte Jenkins, 972 So. 2d 159, 164 (Ala. 2005). See also McMillan v. State, 258 So. 3d 1154, 1185-86 (Ala. Crim. App. 2017) ('The right to

---

[5]The Fair Justice Act, § 13A-5-53.1(b), Ala. Code 1975, provides:

> "In all cases where the defendant is deemed indigent or as the trial judge deems appropriate, the trial court, within 30 days of the entry of the order pronouncing the defendant's death sentence, shall appoint the defendant a separate counsel for the purposes of post-conviction relief under this section."

That subsection became effective August 1, 2017—after Lane was sentenced to death—and thus does not apply here. § 13A-5-53.1(j), Ala. Code 1975 ("This section shall apply to any defendant who is sentenced to death after August 1, 2017.").

29

counsel does not extend to postconviction proceedings.'), and Hamm v. State, 913 So. 2d 460, 473 (Ala. Crim. App. 2002) (holding that Rule 32 petitioner had no right to counsel in Rule 32 proceedings). Indeed, the United States Supreme Court has held that states are not constitutionally required to provide an avenue for postconviction review of a conviction and sentence, much less to provide counsel during such proceedings.

> "'Postconviction relief is even further removed from the criminal trial than is discretionary direct review. It is not part of the criminal proceeding itself, and it is in fact considered to be civil in nature. See Fay v. Noia, 372 U.S. 391, 423-424, 83 S. Ct. 822, 841, 9 L. Ed. 2d 837 (1963). It is a collateral attack that normally occurs only after the defendant has failed to secure relief through direct review of his conviction. States have no obligation to provide this avenue of relief, cf. United States v. MacCollom, 426 U.S. 317, 323, 96 S. Ct. 2086, 2090-2091, 48 L. Ed. 2d 666 (1976) (plurality opinion), and when they do, the fundamental fairness mandated by the Due Process Clause does not require that the State supply a lawyer as well.'

"Pennsylvania v. Finley, 481 U.S. 551, 556-57, 107 S. Ct. 1990, 95 L. Ed. 2d 539 (1987).

> "'Pennsylvania v. Finley should apply no differently in capital cases than in noncapital cases. State collateral proceedings are not constitutionally required as an adjunct to the state criminal proceedings and serve a different and more limited purpose than either the trial or appeal. The additional safeguards imposed by the Eighth Amendment at the trial stage of a capital case are, we think, sufficient to assure the

> reliability of the process by which the death penalty is imposed. We therefore decline to read either the Eighth Amendment or the Due Process Clause to require yet another distinction between the rights of capital case defendants and those in noncapital cases.'

> "Murray v. Giarratano, 492 U.S. 1, 10, 109 S. Ct. 2765, 106 L. Ed. 2d 1 (1989) (footnote omitted)."

Riley v. State, 270 So. 3d 291, 301-02 (Ala. Crim. App. 2018).

Lane asserts that "every death row prisoner in Alabama who has timely filed a Rule 32 petition has been appointed counsel when counsel has been requested." (Lane's brief, p. 15.) Lane cites no evidence to support that assertion.

Lane cites the provision in Rule 32.7(c) requiring the circuit court to appoint counsel "if it appears that the petitioner is indigent or otherwise unable to obtain the assistance of counsel and desires the assistance of counsel, and it further appears that counsel is necessary to assert or protect the rights of the petitioner." In citing that provision, Lane omits the first phrase of Rule 32.7(c): "If the court does not summarily dismiss the petition …." The circuit court summarily dismissed Lane's petition, and thus Rule 32.7(c) does not apply.

31

Lane cites cases highlighting counsel and the need for the assistance of counsel in a postconviction proceeding.[6] He also cites, as evidence of a policy supporting the assistance of counsel in a postconviction proceeding, § 13A-5-53.1(b), Ala. Code 1975, which, as a part of the Fair Justice Act, provides an indigent defendant sentenced to death after August 1, 2017, a right to postconviction counsel. Lane was sentenced to death before August 1, 2017, and thus the Fair Justice Act does not apply to Lane. We reject any invitation from Lane for this Court to expand the reach of the Fair Justice Act beyond its terms. Cf. Ex parte McCormick, 932 So. 2d 124, 132 (Ala. 2005) ("In any case involving statutory construction, our inquiry begins with the language of the statute, and if the meaning of the statutory language is plain, our analysis ends there.").

---

[6]Attorneys for the Equal Justice Initiative, who also represented Lane in his direct appeal and in this appeal, prepared his postjudgment "objection and motion for reconsideration" in which Lane objected to the circuit court's failure to appoint counsel. (C. 313-36.) On appeal, counsel for Lane asserts that, "[a]s a pro se imprisoned petitioner, Mr. Lane lacked the skills, resources, and ability to adequately respond to the State's 57-page answer and motion to dismiss." (Lane's brief, p. 18.) Despite counsel's assessment of Lane's abilities and resources, Lane began these proceedings pro se by filing a verified petition that is 88 typed pages and is composed of 194 numbered paragraphs. (C. 6-93.)

To the point that Lane asserts that the circuit court erred in summarily dismissing his petition without giving him a chance to respond to the State's answer and motion to dismiss, that assertion lacks merit.[7] See, e.g., Mashburn v. State, 148 So. 3d 1094, 1114 (Ala. Crim. App. 2013) ("[E]ven if Mashburn did not have an opportunity to respond to the State's answer and motion to dismiss, this Court has held that Rule 32 does not require a circuit court to permit a Rule 32 petitioner to file a response to the State's answer or motion to dismiss."); Jenkins v. State, 105 So. 3d 1234, 1244-45 (Ala. Crim. App. 2011) ("[A]s Alabama courts have repeatedly held, 'Rule 32.7(d), Ala. R. Crim. P., allows the trial court to summarily dismiss a Rule 32 petition that, on its face, is precluded or fails to state a claim, and [the Alabama Supreme Court has] held that the trial court may properly summarily dismiss such a petition without waiting for a response to the petition from the State.' Ex parte Ward, 46 So. 3d [888,] 897 [(Ala. 2007)] (citing Bishop v. State, 608 So. 2d 345, 347-48 (Ala. 1992) ('Where a simple reading of a petition for post-conviction

---

[7]Lane did not move to amend his petition in the circuit court. Thus, to the point that he tries to raise this as an independent claim, it is not properly before this Court. See, e.g., Boyd v. State, 913 So. 3d 1113, 1123 (Ala. Crim. App. 2003).

33

relief shows that, assuming every allegation of the petition to be true, it is obviously without merit or is precluded, the circuit court [may] summarily dismiss that petition without requiring a response from the district attorney.'))").

Lane had no right to counsel in his postconviction proceedings, and he is due no relief on this claim.

## II. CIRCUIT COURT'S ADOPTION OF THE STATE'S PROPOSED ORDER

Lane challenges the circuit court's adoption of the State's proposed order, arguing that it "created the appearance of bias, prevented [him] from developing facts before an impartial decision-maker, adjudicated his claims in an unreasonable manner," and violated his constitutional rights.[8] (Lane's brief, pp. 25-26.)  In support of his position, he relies centrally on Ex parte Jenkins, 105 So. 3d 1250 (Ala. 2012), Ex parte Scott, 262 So. 3d 1266 (Ala. 2011), and Ex parte Ingram, 51 So. 3d 1119 (Ala. 2010). (Lane's brief, pp. 21-26.)

This Court recently addressed a similar claim in State v. Lewis, 371 So. 3d 863 (Ala. Crim. App. 2022):

---

[8]Lane preserved this issue by raising it in his postjudgment motion. Cf. State v. Lewis, 371 So. 3d 863, 894 (Ala. Crim. App. 2022).

34

"In [Ex parte] Ingram, [51 So. 3d 1119 (Ala. 2010)], the Alabama Supreme Court reversed the circuit court's adoption, in toto, of the State's proposed order denying a postconviction petition.

"'[T]he Alabama Supreme Court has admonished that "appellate courts must be careful to evaluate a claim that a prepared order drafted by the prevailing party and adopted by the trial court verbatim does not reflect the independent and impartial findings and conclusions of the trial court." Ex parte Ingram, 51 So. 3d 1119, 1124 (Ala. 2010).

"'In Ingram, the Supreme Court held that the circuit court's adoption of the State's proposed order denying postconviction relief was erroneous because, it said, the order stated that it was based in part on the personal knowledge and observations of the trial judge when the judge who actually signed the order denying the postconviction petition was not the same judge who had presided over Ingram's capital-murder trial. "[T]he patently erroneous nature of the statements regarding the trial judge's 'personal knowledge' and observations of Ingram's capital-murder trial undermines any confidence that the trial court's findings of fact and conclusions of law are the product of the trial judge's independent judgment ...." Ingram, 51 So. 3d at 1125.'

"Ray v. State, 80 So. 3d 965, 971-72 (Ala. Crim. App. 2011).

"A year later, the Supreme Court reconsidered Ingram in Ex parte Scott, 262 So. 3d 1266 (Ala. 2011). In Scott, the Supreme Court reversed the court's judgment because the court adopted the State's answer to Scott's postconviction petition as its final order denying relief.

35

"In 2012, the Supreme Court addressed this issue again in Ex parte Jenkins, 105 So. 3d 1250 (Ala. 2012), and clarified its earlier holdings. In upholding the circuit court's adoption of the State's proposed order, the Alabama Supreme Court stated:

"'The circumstances of this case differ from the circumstances presented in Ex parte Ingram and Ex parte Scott. In both of those cases it was clear from evidence before this Court that the orders signed by the trial court were not the product of the trial court's independent judgment. In Ingram, that fact was clear from the statements contained in the order regarding the trial judge's "personal knowledge" and observations of Ingram's capital-murder trial when the trial judge signing the proposed Rule 32 order did not preside over Ingram's capital-murder trial. In Ex parte Scott, that fact was clear from the materials before this Court, which contained the State's responsive pleading adopted by the trial court as its order. In this case, however, there is nothing definitive in the record or on the face of the order that indicates that the order is not the product of the trial court's independent judgment.

"'....

"'This Court's decision today should not be read as entitling a petitioner to relief in only those factual scenarios similar to those presented in Ex parte Ingram and Ex parte Scott. A Rule 32 petitioner would be entitled to relief in any factual scenario when the record before this Court clearly establishes that the order signed by the trial court denying postconviction relief is not the product of

36

the trial court's independent judgment. See <u>Ex parte Ingram</u>.'

"<u>Ex parte Jenkins</u>, 105 So. 3d at 1260. 'Alabama courts have consistently held that even when a trial court adopts verbatim a party's proposed order, the findings of fact and conclusions of law are those of the trial court and they may be reversed only if they are clearly erroneous.' <u>McGahee v. State</u>, 885 So. 2d 191, 229-30 (Ala. Crim. App. 2003).

"The order in this case suffered from none of the defects present in the above-cited cases. The order did not contain references to the author's personal observations when, in fact, the postconviction judge was not the judge who presided over the trial. Nor was the order adopted from pleadings made by either party. In a similar case upholding the lower court's adoption of a proposed order, this Court stated:

" 'Here, the fact situation is distinguishable from the fact situations in both <u>Ex parte Ingram</u> and <u>Ex parte Scott</u>. In this case, the circuit judge who denied McWhorter's postconviction petition did not preside at McWhorter's trial; however, in the order denying McWhorter's postconviction petition the court did not profess to have personal knowledge of the performance of McWhorter's trial counsel. Further, the circuit court in this case did not base its order denying McWhorter's postconviction petition upon the State's initial answer to the postconviction petition. Instead, after numerous pleadings, and after the postconviction evidentiary hearing on McWhorter's Rule 32 claims, the court allowed submission of briefs. Both the State and McWhorter submitted proposed orders, and McWhorter submitted a post-hearing brief. McWhorter did not object in his post-hearing brief to the possibility of the circuit court's adopting the

37

State's proposed order. The circuit court did not issue its final order until several weeks after both the State and McWhorter had submitted their proposed orders and McWhorter had filed his post-hearing brief.'

"McWhorter v. State, 142 So. 3d 1195, 1229 (Ala. Crim. App. 2011).

"The same is true in this case. For the above reasons, we find no error in the postconviction-court's adoption, in part, of Lewis's proposed order granting relief in the penalty phase. The State is due no relief on this claim."

371 So. 3d at 894-96.

Unlike the order in Scott, which adopted the State's answer, the circuit court adopted the State's proposed order. Lane asserts that the circuit court's order does not "reflect [its] independent and impartial findings and conclusions," Ex parte Ingram, 51 So. 3d at 1124. He contends that the order "reflects the 'adversarial zeal' of the State's adversarial documents." (Lane's brief, p. 24.) In support of that assertion, he cites the order's statement that "[e]yewitness reports also placed Lane at the murder scene," but, Lane says, there were no such eyewitnesses. As this Court noted on direct appeal, however, Wilson's neighbor James Jay testified that he saw Lane's truck "parked across the street from Wilson's house" around 8:30 a.m. the morning of the murder and "that he

saw a person get out of the truck and walk to the front porch of Wilson's home, at which point [his] view of the person became obstructed by shrubbery." Lane, 80 So. 3d at 286.

Lane also cites two typographical errors present in the both the proposed order and the circuit court's order: a reference to Lane's expert by only his first name "George" and the word "ismissed" instead of "dismissed." (C. 203, 228, 248, 268.) Those minor errors do not show, however, that the findings of the circuit court in its order are "clearly erroneous," nor has Lane shown that the circuit court's adoption of the State's proposed order was erroneous. See Davis v. State, 184 So. 3d 415, 448-49 (Ala. Crim. App. 2014) ("The circuit court's order in the present case does not contain such 'patently erroneous' errors like the order in Ingram. … We have reviewed the State's response, as well as the circuit court's order dismissing Davis's petition, and have found none of the 'adversarial zeal' that was described in Scott. In fact, Davis does not identify any specific portions of the circuit court's order that he believes contains such 'adversarial zeal,' nor does he allege that any portions are clearly erroneous. Instead, he merely points to two typographical errors that appear in both the State's proposed order and the circuit court's

39

order. ... 'We do not consider the few typographical errors at issue here, by themselves, as sufficient evidence upon which to base a conclusion that the trial court's order is not a product of the trial court's independent judgment.' [Scott, 262 So. 3d at 1273]."). We hold that the circuit court did not commit reversible error by adopting the State's proposed order as its own.

## III. INEFFECTIVE-ASSISTANCE-OF-COUNSEL CLAIMS

Lane reiterates his claims asserting that his trial counsel were ineffective. He argues that the circuit court erred in summarily dismissing those claims.

We use these principles in reviewing claims asserting ineffective assistance of counsel:

> "'To prevail on a claim of ineffective assistance of counsel, the petitioner must show (1) that counsel's performance was deficient and (2) that the petitioner was prejudiced by the deficient performance. See Strickland v. Washington, 466 U.S. 668 (1984).
>
> > "'"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense

40

after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."

"'Strickland, 466 U.S. at 689.

"'"[T]he purpose of ineffectiveness review is not to grade counsel's performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S. Ct. [2052] at 2065 [(1984)]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir. 1992) ('We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.'). We recognize

41

that '[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.' <u>Strickland</u>, 104 S. Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.' <u>Burger v. Kemp</u>, 483 U.S. 776, 107 S. Ct. 3114, 3126, 97 L. Ed. 2d 638 (1987)."

"'<u>Chandler v. United States</u>, 218 F.3d 1305, 1313–14 (11th Cir. 2000) (footnotes omitted).

"'An appellant is not entitled to "perfect representation." <u>Denton v. State</u>, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). "[I]n considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" <u>Burger v. Kemp</u>, 483 U.S. 776, 794 (1987).'

"<u>Yeomans v. State</u>, 195 So. 3d 1018, 1025-26 (Ala. Crim. App. 2013). Additionally, '"[w]hen courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger."' <u>Ray v. State</u>, 80 So. 3d 965, 977 n.2 (Ala. Crim. App. 2011) (quoting <u>Chandler v. United States</u>, 218 F.3d 1305, 1316 (11th Cir. 2000)).

"We also recognize that when reviewing claims of ineffective assistance of counsel 'the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.' Strickland v. Washington, 466 U.S. 668, 698, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)."

Marshall, 182 So. 3d at 582-83.

## A. GUILT-PHASE CLAIMS

## 1. CLAIMS RELATED TO THE CHISEL-MARKS EVIDENCE AND EVIDENCE ABOUT FORCED ENTRY

### a. FAILURE TO HIRE AN EXPERT AND PRESENT EXPERT TESTIMONY

Lane alleged that his trial counsel were ineffective because

"counsel failed to seek funding, obtain, or present an expert in crime scene investigation and forensics to provide critical testimony regarding whether there had been any evidence of forced entry, in particular the chisel marks on the door. Trial counsel further failed to file a motion for discovery or otherwise request from the State the entire raw file or memory card of photographs, or copies of all the photographs taken by investigators on October 12, 2003."

(Lane's brief, p. 31 (citing C. 21).) Lane asserts that there was "a lack of evidence of forced entry on October 12" and "that the chisel marks likely were made on the door after the crime scene investigation concluded on October 12." (Lane's brief, p. 35.)

The circuit court dismissed this claim for two reasons. First, the

43

court found that the adequacy of " 'the State's investigation is not a proper subject for expert testimony.' " (C. 285 (quoting <u>Stanley v. State</u>, 335 So. 3d 1, 33 (Ala. Crim. App. 2020).) Second, the court found the claim insufficiently pleaded because, although Lane named an expert—George Schiro—and asserted generally that Schiro was available to testify in his 2016 trial, Lane did "not assert that [his] trial counsel should have reasonably been aware of Schiro's existence or that the proffered testimony would have been admissible." (C. 286.) The circuit court also found the claim insufficiently pleaded because Lane did not specifically assert that Schiro had been qualified to testify as an expert in Alabama before Lane's 2016 trial.

On appeal, Lane disputes both reasons the circuit court cited. First, Lane characterizes his claim not as one asserting that an expert was needed to challenge to the State's investigation but that expert testimony was needed to rebut the State's theory. This is a distinction without a difference. Lane pleaded that his expert Schiro would have testified that if the chisel marks existed on October 12, the State should have observed them in its investigation. Thus, Schiro's testimony hinged on the adequacy of the State's investigation, which, under Rule 702, Ala. R.

Evid., is not a proper subject for expert testimony. See Stanley, 335 So. 3d at 33-34 (holding that challenging the quality of the State's investigation is not a proper subject for expert testimony).

Second, Lane asserts that he adequately pleaded the claim because he asserted generally that "Schiro has been working in this field for almost four decades and has been certified as a criminal investigations and forensics expert in several cases in Alabama courts, including a post-conviction proceeding." (Lane's brief, p. 36.) By failing to plead that Schiro was qualified and available to testify at Lane's trial in 2016, however, Lane did not adequately plead the claim. See, e.g., Thompson v. State, 310 So. 3d 850, 870 (Ala. Crim. App. 2018) ("Thompson failed to plead that Dr. Oral was available and that she could have testified as an expert witness in Alabama in 2005. Thus, Thompson failed to plead the 'full facts' in regard to this claim. See Rule 32.6(b), Ala. R. Crim. P."); see also Brooks v. State, 340 So. 3d 410, 437 (Ala. Crim. App. 2020) (discussing what a petitioner must plead to show that his or her trial counsel were ineffective for failing to consult and call an expert to testify at the petitioner's trial).

The circuit court did not err in summarily dismissing this claim.

45

### b. FAILURE TO PRESENT EVIDENCE DISPUTING A FORCED ENTRY

Lane asserted that his trial counsel should have

"request[ed] the notes, documentation, or underlying memory device or storage file used by investigators to take and record pictures on the day of Ms. Lane's death. … [N]otes by 15 investigators charged with fully documenting the scene, other documentation, and photographs by investigators on October 12 taken of the front door—that was being used by all the investigators on that day and that would have been considered a potential point of entry during a burglary—could have established that no toolmarks existed and that the chain lock was still intact on the day of Ms. Lane's death. As plead[ed], in a routine investigation, investigators would have included photographs of the front door, the front door jamb, the locking mechanisms, and the chain lock, as well as similar photographs of any other potential point of entry, but trial counsel never requested these items or the underlying memory or storage device used to document the scene on October 12."

(Lane's brief, pp. 39-40 (citing C. 29-31).) Lane asserts that if counsel had obtained the records, "they would have been visual confirmation of the testimony of Iris Raley, the daughter of Ms. Wilson, who testified that after police were finished with the scene on October 12, she went to the front door and locked it herself." (Lane's brief, pp. 41-42.)

The circuit court summarily dismissed this claim as insufficiently pleaded because Lane did not plead that such a storage device or records actually existed—thus his claim was based on speculation that "standard

46

police protocol" would have included a storage device or the records Lane asserts counsel should have obtained. The circuit court also found that Lane's claim, by its own terms, would have been cumulative to Iris Raley's testimony. (C. 286-87.)

On appeal, Lane reasserts that his allegations that the State "took dozens of photographs as part of [its] investigation" and that no photographs of the front door were admitted at trial met his burden of pleading. (Lane's brief, p. 40.)  But even if true those allegations require speculation to conclude that a storage device or records existed. As the petitioner, Lane had to plead the full factual basis for this claim, which includes that the storage device or records existed—not that they might exist. See Mashburn, 148 So. 3d at 1125 ("Speculation is not sufficient to satisfy a Rule 32 petitioner's burden of pleading.").  And as the circuit court found, even if the evidence existed, that evidence would be cumulative of Raley's testimony. "[T]he withholding of cumulative testimony will not ordinarily satisfy the prejudice component of a claim of ineffective assistance of counsel."  Stallworth v. State, 171 So. 3d 53, 74 (Ala. Crim. App. 2013)

The circuit court did not err in summarily dismissing this claim as

insufficiently pleaded.

## 2. FAILURE TO CHALLENGE THE ADMISSIBILITY OF MILROY'S TESTIMONY

Lane asserts that his "trial counsel failed to do the bare minimum to counter or in any way challenge the admission of the testimony of the State's toolmarks expert" Scott Milroy. (Lane's brief, p. 43.) Lane alleged that "Milroy's experience in ballistic toolmark analysis did not qualify him as an expert in impression-type chisel-mark analysis." (Lane's brief, p. 44.)

This Court has held that "[e]ven if a claim of ineffective assistance of counsel is sufficiently pleaded, … counsel is not ineffective for failing to raise a meritless claim." Brooks, 340 So. 3d at 442. See also Carruth v. State, 165 So. 3d 627, 641 (Ala. Crim. App. 2014) (counsel is not ineffective for failing to raise a meritless objection); Yeomans v. State, 195 So. 3d 1018, 1034 (Ala. Crim. App. 2013) ("[B]ecause there is no merit to the legal theory underlying this claim of ineffective assistance, the claim was properly dismissed.").

On direct appeal, this Court addressed the underlying claim and held that it had no merit:

> "The record supports the conclusion that Milroy was

48

qualified to testify as a firearms-and-toolmarks expert and that the marks on Wilson's front door fell within that field of expertise, i.e., were toolmarks. Any lack of experience Milroy might have had specifically with chisels or 'impressed toolmark[s]' went to the <u>weight</u> of Milroy's testimony, <u>not its admissibility</u>. Thus, <u>we find no error</u>, much less plain error, in allowing Milroy to testify regarding his conclusions from the toolmarks analysis he performed in this case."

<u>Lane</u>, 327 So. 3d at 744 (emphasis added).  Based on this holding, the circuit court summarily dismissed Lane's claim that his counsel should have challenged the admissibility of Milroy's testimony.

Lane argues that "the ruling on direct appeal is not dispositive of the ineffectiveness claim here." (Lane's brief, p. 45.)

"In <u>Woodward v. State</u>, 276 So. 3d 713, 768-69 (Ala. Crim. App. 2018), the circuit court rejected a petitioner's claim that his counsel was ineffective for not objecting to certain testimony. The circuit court relied on this Court's holding in the petitioner's direct appeal that the underlying claim had no merit. On appeal, the petitioner argued 'that the circuit court's finding that claim was meritless because it was rejected by this Court on direct appeal' conflicted with <u>Ex parte Taylor</u>, 10 So. 3d 1075 (Ala. 2005). This Court disagreed:

"'In <u>Ex parte Taylor</u>, the Alabama Supreme Court held that "a determination on direct appeal that there has been no plain error does not automatically foreclose a determination of the existence of the prejudice required under <u>Strickland</u> to sustain a claim of ineffective assistance of counsel." 10 So. 3d at 1078. However, <u>Ex parte Taylor</u> applies only to the prejudice prong of <u>Strickland</u>, not to the deficient-performance

49

> prong. See Clark v. State, 196 So. 3d 285, 311 n.4 (Ala. Crim. App. 2015). Because this Court's holding on direct appeal establishes that counsel's performance was not deficient, Ex parte Taylor is inapplicable.'

"Woodward, 276 So. 3d at 769.

Largin v. State, 392 So. 3d 997, 1030-31 (Ala. Crim. App. 2022), cert. denied (No. SC-2023-0231, Nov. 17, 2023). This Court on direct appeal held that Milroy was, in fact, qualified. Lane does not address this Court's holding in Lane, nor does he address the circuit court's reliance on that holding. This Court's holding in Lane refutes the claim on which Lane bases his argument that his counsel performed deficiently. Because Milroy was qualified to testify, counsel's failure to object was not deficient performance. See Woodward v. State, 276 So. 3d 713, 768-69 (Ala. Crim. App. 2018); see also Brooks, supra; Carruth, supra; Yeomans, supra.

The circuit court did not err in summarily dismissing this claim.

### 3. FAILURE TO PRESENT EXPERT TESTIMONY ABOUT THE CHISEL FOUND IN LANE'S TRUCK

Lane alleged that counsel should have "retain[ed] an expert to rebut Mr. Milroy's testimony that the chisel found in Mr. Lane's truck was the only chisel in the world that could have broken into Indy Wilson's home." (C. 38-39.) Lane asserted that counsel should have retained John Nixon,

50

"an expert consultant in this field for 26 years and [who] has been certified as a toolmarks expert in numerous state and federal courts" and who "would have been available, qualified to testify, and willing and able to testify at Mr. Lane's trial" in 2016. (C. 39.)

The circuit court summarily dismissed this claim:

"First, although Lane generally asserts that Nixon is an experienced toolmarks expert who has been 'certified as a toolmarks expert in numerous state and federal courts,' Lane does not proffer any facts to support his assertion that Nixon is actually a qualified expert. Second, Lane does not proffer what testimony Nixon would have offered to challenge the actual conclusions Milroy drew from his analysis of the impressed toolmarks on Wilson's front door. Rather, he merely asserts that Nixon would have challenged Milroy's testimony that 'not another chisel in the world' could have made the impression was an 'improper' statement based on literature and court opinions from other jurisdictions. … He does not allege that Nixon would have presented testimony challenging the underlying analysis Milroy performed as faulty or allege that without expert testimony, Milroy's testimony could not have been challenged with then-available literature and court opinions. Finally, Lane has not alleged any facts that counsel should have reasonably been aware of Nixon's existence or that his proffered testimony would have been admissible. Thompson [v. State], 310 So. 3d [850,] 870 [(Ala. Crim. App. 2018)]. As such, he has not sufficiently pleaded a full factual basis to demonstrate under Strickland that counsel performed deficiently and that such alleged deficient performance resulted in actual prejudice."

(C. 289-90.)

On appeal, Lane addresses only the second reason given by the

51

circuit court—"about what testimony Nixon would have offered." Lane

argues that he pleaded sufficient facts

> "about what testimony Nixon would have offered to challenge
> … Milroy's conclusions (C. 252); Mr. Lane specifically pled
> that Nixon would have offered testimony—with explicit
> reference to the 2009 National Academy of Science Report on
> Forensic Science, President's Council of Advisors on Science
> and Technology 2016 report and 2017 addendum, and
> federal and state court opinions—that explained that Mr.
> Milroy's testimony that there was 'not another chisel in the
> world' (R. 1617) besides the one found in Mr. Lane's truck,
> that could have left the marks on the front door, was an
> improper opinion against the literature in the field of
> toolmarks that was irresponsible and unfounded in science.
> (C. 40-41.)"

(Lane's brief, pp. 48-49.) Lane does not address the other two reasons

cited by the circuit court. Thus, Lane has shown no reversible error giving

him a right to relief on this issue. See, e.g., Matherly v. Citizens Bank,

375 So. 3d 776, 783 (Ala. 2022) ("'[A] challenge to the judgment is waived

where ... the trial court actually states two grounds for its judgment, both

grounds are championed by the appellee, and the appellant simply

declines to mention one of the two grounds.' Soutullo v. Mobile Cnty., 58

So. 3d 733, 739 (Ala. 2010).").

### 4. FAILURE TO INVESTIGATE, OBTAIN, AND PRESENT EVIDENCE RELATED TO THE BATHTUB DRAIN

Lane alleged that his counsel failed to "investigate, obtain, and

present evidence related to whether the overflow drain in the bathtub …
was functioning properly." (C. 43.) He asserted that, although trial
counsel had argued that it was impossible "for Mr. Lane to have
committed the crime under the timeline given by the State because if the
water in the bathtub had been left running for almost an hour after
[Theresa] was murdered, as the State's theory required, then it would
have overflowed on the floor," counsel were ineffective for not hiring "an
investigator to analyze the precise plumbing fixtures soon after the
incident or introduce expert testimony at trial" to challenge the State's
estimated timeline of Theresa's murder. (C. 43-44.)

The circuit court summarily dismissed this claim as lacking merit
because the trial record shows that trial counsel retained an investigator
to test whether the overflow drain was working properly but that the trial
court refused to admit evidence from that test. (C. 291.) This Court held
that the trial court did not err in excluding that evidence. Lane, 327 So.
3d at 744-48.

On appeal, Lane argues that the circuit court misunderstood his
claim:

> "Mr. Lane's claim was not about a demonstration by a private
> investigator years later, but instead asserted that trial

53

counsel should have hired an <u>expert</u> that would have conducted an <u>admissible</u> investigation at the time of Ms. Lane's death to form the basis of their expert opinion."

(Lane's brief, p. 51.) Lane did not plead that counsel should have hired an expert. But even if he had, he failed to meet the pleading requirements for such a claim because he alleged nothing about a named expert that counsel should have hired. <u>See, e.g.</u>, <u>Brooks</u>, 340 So. 3d at 437 (discussing what a petitioner must plead to show that his or her trial counsel were ineffective for failing to consult and call an expert to testify at the petitioner's trial). Lane has thus not shown that the circuit court erred in summarily dismissing this claim. Rule 32.7(d), Ala. R. Crim. P.

### 5. FAILURE TO OBJECT TO ALLEGEDLY INADMISSIBLE EVIDENCE

Lane asserted that trial counsel were ineffective for not objecting to the admission of the following evidence.

### a. PRIOR TESTIMONY FROM FIVE WITNESSES

Lane asserted that his trial counsel in 2016 should have objected to the admission of testimony given in Lane's first trial by Robert Lane, Mixon, Jay, Raley, and LaPointe, each of whom was unavailable for Lane's 2016 trial. (C. 45-46.)

On direct appeal, this Court found no plain error in the admission

of the testimony from those five witnesses. <u>Lane</u>, 327 So. 3d at 716. This Court first discussed the structural error in Lane's first trial:

"On direct appeal of Lane's convictions from his first trial, this Court relied on <u>United States v. Gonzalez-Lopez</u>, 548 U.S. 140, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006), in concluding that the trial court's disqualification of Lane's counsel of choice constituted '"structural error" that cannot be harmless and that automatically requires reversal.' <u>Lane</u>, 80 So. 3d at 302. Specifically, this Court stated:

"'In <u>Gonzalez–Lopez</u>, 548 U.S. 140, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006), the United States Supreme Court noted that the Sixth Amendment right to counsel of choice does not descend from the Sixth Amendment's overarching purpose of ensuring a fair trial, as does the right to the effective assistance of counsel, but it is "the root meaning of the constitutional guarantee." 548 U.S. at 147-48, 126 S. Ct. 2557. Therefore, "[w]here the right to be assisted by counsel of one's choice is wrongly denied ... it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation." <u>Id.</u> at 148, 126 S. Ct. 2557. The Court then went on to explain:

"'"In <u>Arizona v. Fulminante</u>, 499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991), we divided constitutional errors into two classes. The first we called 'trial error,' because the errors 'occurred during presentation of the case to the jury' and their effect may 'be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt.'

55

Id., at 307-308, 111 S. Ct. 1246 (internal quotation marks omitted). These include 'most constitutional errors.' Id., at 306, 111 S. Ct. 1246. The second class of constitutional error we called 'structural defects.' These 'defy analysis by "harmless-error" standards' because they 'affec[t] the framework within which the trial proceeds,' and are not 'simply an error in the trial process itself.' Id., at 309-310, 111 S. Ct. 1246. See also Neder v. United States, 527 U.S. 1, 7-9, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999). Such errors include the denial of counsel, see Gideon v. Wainwright, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963), the denial of the right of self-representation, see McKaskle v. Wiggins, 465 U.S. 168, 177-178, n.8, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984), the denial of the right to public trial, see Waller v. Georgia, 467 U.S. 39, 49, n.9, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984), and the denial of the right to trial by jury by the giving of a defective reasonable-doubt instruction, see Sullivan v. Louisiana, 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993).

"'"We have little trouble concluding that erroneous deprivation of the right to counsel of choice, 'with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as "structural error."' Id., at 282, 113 S. Ct. 2078.

56

Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument. And the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial. In light of these myriad aspects of representation, the erroneous denial of counsel bears directly on the 'framework within which the trial proceeds,' Fulminante, supra, at 310, 111 S. Ct. 1246—or indeed on whether it proceeds at all. It is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings. Many counseled decisions, including those involving plea bargains and cooperation with the government, do not even concern the conduct of the trial at all. Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe."

"'548 U.S. at 148-49, 126 S. Ct. 2557 (footnote omitted; emphasis added).'

"Lane, 80 So. 3d at 302-03.

"In support of his claim that the five unavailable

57

witnesses' prior testimony was inadmissible, Lane notes the United States Supreme Court's conclusion in <u>Gonzalez-Lopez</u> that the erroneous denial of a defendant's counsel of choice is a '"structural error"' that 'bears directly on the "framework within which the trial proceeds,"' <u>Gonzalez-Lopez</u>, 548 U.S. at 150, 126 S. Ct. 2557 (quoting <u>Arizona v. Fulminante</u>, 499 U.S. 279, 282, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)), and results in '"consequences that are necessarily unquantifiable and indeterminate."' <u>Id.</u> (quoting <u>Fulminante</u>, 499 U.S. at 310, 111 S. Ct. 1246). Relying on that language, Lane argues that the erroneous denial of his counsel of choice rendered his first trial a 'tainted proceeding' and that, as a result, the testimony from that trial was inadmissible in his second trial. Lane's brief, at 13. Thus, the issue as to this claim may be framed as follows: When a defendant's conviction is reversed because the defendant was erroneously denied his or her counsel of choice, does that '"structural defect,"' <u>Gonzalez-Lopez</u>, 548 U.S. at 148, 126 S. Ct. 2557, in the defendant's trial render testimony from that trial inadmissible when the testimony is proffered in the defendant's subsequent trial as the prior testimony of an unavailable witness?

"On its face, <u>Gonzalez-Lopez</u> does not address that issue, and Lane's appellate counsel conceded at oral argument that neither the United States Supreme Court nor Alabama's appellate courts have addressed this specific issue. Consistent with counsel's concession, this Court's research has confirmed that this specific issue raises a question of first impression under controlling law. In <u>Townes v. State</u>, 253 So. 3d 447 (Ala. Crim. App. 2015), this Court addressed the propriety of resolving issues of first impression under plain-error review:

"'"It is well settled that plain-error review is an inappropriate mechanism to decide issues of first impression or to effectuate changes in the law." <u>Kelley v. State</u>, 246 So. 3d 1032, 1052 (Ala. Crim. App. 2014). <u>See also</u> <u>United States v. Olano</u>, 507 U.S. 725, 734, 113 S. Ct. 1770, 123 L. Ed. 2d

58

508 (1993) ("[A] court of appeals cannot correct an error [under the plain-error doctrine] unless the error is clear under current law."); <u>United States v. Madden</u>, 733 F.3d 1314, 1322 (11th Cir. 2013) ("For a plain error to have occurred, the error must be one that is obvious and is clear under current law." (citations and quotations omitted)); <u>United States v. Accardi</u>, 669 F.3d 340, 348 (D.C. Cir. 2012) ("[A] question of first impression ... would be inappropriate to address under plain error review."); <u>United States v. Lejarde-Rada</u>, 319 F.3d 1288, 1291 (11th Cir. 2003) ("[T]here can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." (citations omitted)); <u>United States v. Magluta</u>, 198 F.3d 1265, 1280 (11th Cir. 1999) ("[A] district court's error is not 'plain' or 'obvious' if there is no precedent directly resolving an issue."), vacated in part on unrelated grounds, 203 F.3d 1304 (11th Cir. 2000). Whether error resulted from the prosecutor's comment "is an issue of first impression and thus not properly before this Court for plain-error review." <u>Kelley</u>, 246 So. 3d at 1053 (citing <u>Accardi</u>, 669 F.3d at 348).'

"<u>Townes</u>, 253 So. 3d at 494. Thus, because it is a question of first impression whether testimony from a trial in which the defendant was erroneously denied counsel of choice is admissible in the defendant's subsequent trial as the prior testimony of an unavailable witness, plain-error review, which is the standard that applies to this claim, is an '"inappropriate mechanism"' to decide that issue. <u>Townes</u>, 253 So. 3d at 494 (quoting <u>Kelley v. State</u>, 246 So. 3d 1032, 1052 (Ala. Crim. App. 2014)).

"We recognize that, <u>according to Lane</u>, by concluding that 'the erroneous denial of counsel bears directly on the "framework within which the trial proceeds,"' <u>Gonzalez-</u>

Lopez, 548 U.S. at 150, 126 S. Ct. 2557 (quoting Fulminante, 499 U.S. at 282, 111 S. Ct. 1246), Gonzalez-Lopez necessarily implies that testimony from such a structurally defective trial is inadmissible in the defendant's subsequent trial. However, it cannot be said that Gonzalez-Lopez '"directly resolv[ed]"' that issue or that the answer to that question is '"obvious and ... clear"' from Gonzalez-Lopez. Townes, 253 So. 3d at 494 (quoting United States v. Lejarde-Rada, 319 F.3d 1288, 1291 (11th Cir. 2003), and United States v. Madden, 733 F.3d 1314, 1322 (11th Cir. 2013) (emphasis added)). Rather, at most, support for Lane's argument might arguably be inferred from Gonzalez-Lopez, but, as the United States Supreme Court has recognized, a possible inference drawn from a United States Supreme Court decision is not an inevitable one. Crawford v. Washington, 541 U.S. 36, 59, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Thus, whatever inferences might arguably be drawn from Gonzalez-Lopez, it cannot be said that Gonzalez-Lopez constitutes well settled law providing that testimony from a trial in which the defendant was erroneously denied counsel of choice is inadmissible in the defendant's subsequent trial as the prior testimony of an unavailable witness. Therefore, because neither the United States Supreme Court nor this Court has addressed the question of first impression raised by Lane's claim, we will not conclude that the trial court committed plain error by admitting the unavailable witnesses' prior testimony from Lane's first trial. Townes, supra. See also United States v. Wolfname, 835 F.3d 1214, 1221 (10th Cir. 2016) (noting that plain error must be '"clear and obvious" under "current, well-settled law"' (emphasis added; citations omitted)); and United States v. Lin, 101 F.3d 760, 770 (D.C. Cir. 1996) (noting that, to determine that a trial court committed plain error, the alleged error 'must ... have been error under settled law of the Supreme Court or of this circuit' (emphasis added))."

Lane, 327 So. 3d at 714-16.

This Court rejected Lane's argument that, because he did not have

his counsel of choice in his first trial, the admission of testimony from

that trial violated the Confrontation Clause of the Sixth Amendment:[9]

> "'"[T]he Confrontation Clause guarantees only an <u>opportunity</u> for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."' Kentucky v. Stincer, 482 U.S. 730, 739, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987) (quoting Delaware v. Fensterer, 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985)). Thus, the fact that Lane did not have the opportunity to cross-examine the witnesses in his first trial with the counsel of his choice did not constitute a violation of the Confrontation Clause. Nevertheless, Lane suggests that, after Crawford, an adequate opportunity for cross-examination is no longer sufficient to satisfy the Confrontation Clause; instead, Lane argues, there must be some indication that the cross-examination met some minimal threshold of adequacy. Ignoring the fact that Lane does not allege that the cross-examination in his first trial was inadequate, we note that Crawford set forth no such rule.[8] As the United States Court of Appeals for the Fifth Circuit has noted, 'the Supreme Court's watershed decision in Crawford ... did not purport to set forth new standards governing the effectiveness of cross-examination. To the contrary, the Court reaffirmed its precedents holding that "an adequate opportunity to cross-examine" a now-unavailable witness would satisfy the Confrontation Clause.' United States v. Richardson, 781 F.3d 237, 244 (5th Cir. 2015) (first and third emphasis added). Thus, because Lane had an adequate opportunity to cross-examine the witnesses in his first trial and because five of those witnesses were no longer available by the time of Lane's second trial, the admission of those five witnesses' prior testimony did not violate the Confrontation Clause. Therefore, as to this aspect of Lane's

---

[9]"In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const., amend. VI.

claim, we find no error, much less plain error, in the trial court's admission of the prior testimony of the five unavailable witnesses.

"_____

"[8]Lane does not identify any alleged deficiencies in defense counsel's cross-examination during Lane's first trial but, rather, merely suggests that his counsel of choice might have conducted cross-examination differently. Lane's brief, at 12."

Lane, 327 So. 3d at 717.

In summarily dismissing Lane's ineffectiveness claim, the circuit court relied on this Court's opinion on direct appeal addressing the underlying issues. The circuit court noted that, because there was no dispute that Lane had an opportunity to cross-examine the witnesses at his first trial, there was no violation of his right to confrontation. The circuit court also rejected Lane's suggestion that "a choice of counsel violation … during Lane's first trial … create[d] an automatic assumption rendering cross-examination of witnesses deficient and therefore inadmissible in his new trial." (C. 292.) The circuit court found that Lane had to plead facts showing "that counsel's failure to object when this testimony was offered resulted in actual prejudice." (C. 293.)

On appeal, Lane reiterates the arguments raised in his 2020

appeal. He argues that the structural error in his first trial at which those witnesses testified "saddled [him] with the cross-examination of these witnesses conducted by the lawyers from the first trial, whose representation" this Court held in 2010 violated his right to the counsel of his choice. (Lane's brief, p. 53.) He argues that the admission of that testimony also "violated [his] right to confrontation because he never had the opportunity to effectively cross-examine the witnesses with his counsel of choice." (Lane's brief, p. 53.)

To the point that this ineffectiveness claim turns on counsel not raising a question of first impression, Lane is due no relief. This Court in Lane emphasized that plain-error review is an "inappropriate mechanism" for deciding a question of first impression. This Court has likewise held:

> "[A] defendant's counsel cannot be deemed ineffective for failing to raise a novel claim that hinges on a legal question of first impression. Although a particularly creative and adept attorney might raise such a claim, the Strickland test 'has nothing to do with what the best lawyers would have done' or 'even what most good lawyers would have done.' Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir. 2001) (citation omitted). Instead, Strickland requires 'only a "'reasonably competent attorney,'"' which is to say that it 'does not guarantee perfect representation,' Harrington v. Richter, 562 U.S. 86, 110, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) (quoting Strickland, 466 U.S. at 687, 104 S. Ct. 2052), or even 'ideal'

63

representation. Mickens v. Taylor, 240 F.3d 348, 363 (4th Cir. 2001). See also United States v. Valas, 40 F.4th 253, 260 (5th Cir. 2022) ('[T]he Sixth Amendment entitles a criminal defendant to reasonable, but not perfect, representation of counsel.' (citation omitted)). To hold that a defendant's counsel renders ineffective assistance by failing to raise a novel claim that hinges on a legal question of first impression would be to require representation that goes beyond that which is reasonable and to require representation that begins to approach perfection."

McCoy v. State, 387 So. 3d 261, 267-68 (Ala. Crim. App. 2023), cert. denied (No. SC-2023-0343, June 23, 2023). And to the point that Lane's claim turns on a violation of his right to confrontation, this Court in Lane held that "the admission of those five witnesses' prior testimony did not violate the Confrontation Clause." 327 So. 3d at 717. Indeed, as to that part of Lane's claim, this Court found "no error, much less plain error, in the trial court's admission of the prior testimony of the five unavailable witnesses." Id. Thus, there is no merit to Lane's assertion that his counsel performed deficiently. See Woodward, supra; Brooks, supra; Carruth, supra; Yeomans, supra.

The circuit court did not err in summarily dismissing this claim. See Rule 32.7(d), Ala. R. Crim. P.

## b. EVIDENCE THAT LANE PAID AN ATTORNEY ON THE DAY HE WAS ARRESTED

Lane alleged that his counsel were ineffective for not objecting at trial to evidence about a receipt showing that Lane paid attorney Buzz Jordan $1,000 one day after Theresa was discovered dead. (C. 51.)

On direct appeal, this Court found no plain error in the admission of evidence about the payment:

> "Read in context, it is evident that the prosecutor did not imply that the $1,000 payment was in and of itself incriminating evidence. Rather, it is clear that the prosecutor referenced the $1,000 payment in an attempt (1) to demonstrate that, around the time Theresa was murdered, Lane was making significant expenditures, despite his limited financial resources, in an attempt to finalize his divorce and to marry Abe—facts that, the prosecutor argued, tended to prove Lane murdered Theresa because he needed to collect the proceeds of her life-insurance policy—and (2) to cast doubt on defense counsel's argument that Lane sought to collect the proceeds of Theresa's life-insurance policy so that he could pay to have Theresa buried. See [United States v.] Frazier, 944 F.2d [820,] 826-27 [(11th Cir. 1991)] (noting that a reference to the fact that defendant sought legal counsel 'is especially permissible when the prosecutor is responding to a potentially misleading argument by defense counsel'). Thus, it is clear to this Court that the prosecutor's references to the $1,000 payment were directly tied to relevant issues in the case and were not intended to imply that the payment was in and of itself proof of Lane's guilt. Compare Dendy v. State, 896 So. 2d 800, 804 (Fla. Dist. Ct. App. 2005) (where prosecutor argued that defendant's 'request ... for a lawyer before his arrest was evidence of his "consciousness of guilt"'); People v. Meredith, 84 Ill. App. 3d 1065, 40 Ill. Dec. 214, 405 N.E.2d

1306, 1312 (1980) (where prosecutor argued that defendant '"knew he had shot those people that is why he went to call his lawyer in the morning"'); and Zemina v. Solem, 438 F. Supp. 455, 465 (D.S.D. 1977) (where prosecutor argued that '[t]he fact that [defendant] called his lawyer is a telling sign').

> "Based on the foregoing, we conclude that evidence of the $1,000 payment and the prosecutor's arguments regarding that evidence did not give rise to an 'unavoidable inference,' Arthur [v. State], 575 So. 2d [1165,] 1178 [(Ala. Crim. App. 1990)], that the payment was proof of Lane's consciousness of guilt. In fact, when such evidence and arguments are considered in context, we conclude that it was unlikely that the jury drew such an inference."

Lane, 327 So. 3d at 754-55. This Court also rejected Lane's claim that admission of the evidence violated the attorney-client privilege:

> "[T]he payment of attorney fees generally is not protected by the attorney-client privilege—a fact Lane concedes. Lane's brief, at 64. See O'Neal v. United States, 258 F.3d 1265, 1276 (11th Cir. 2001) ('[I]nformation involving receipt of attorneys' fees from a client is not generally privileged.'); In re Grand Jury Subpoena, 204 F.3d 516, 520 (4th Cir. 2000) (same); and Matter of Grand Jury Proceeding, Cherney, 898 F.2d 565, 567 (7th Cir. 1990) (same). Nevertheless, Lane argues that an exception to this principle exists when evidence of an attorney-client fee arrangement 'would itself reveal a confidential communication.' In re Grand Jury Subpoena for Attorney Representing Criminal Defendant Reyes-Requena, 926 F.2d 1423, 1431 (5th Cir. 1991). That 'narrow exception,' id., is not applicable here, however, because evidence of the $1,000 payment to Jordan did not reveal any confidential communications between Lane and Jordan."

Lane, 327 So. 3d at 755 n.17.

66

In summarily dismissing this claim, the circuit court cited, as showing that the underlying claim has no merit, this Court's finding of no plain error on direct appeal.

On appeal, Lane does not address this Court's analysis finding no plain error or this Court's analysis of his attorney-client-privilege argument. He merely reiterates the arguments he made on direct appeal and asserts that his counsel were ineffective for not objecting to the evidence.  Because his petition does not show that the underlying claim has merit, Lane has no right to relief. See Woodward, supra.

The circuit court did not err in summarily dismissing this claim. See Rule 32.7(d), Ala. R. Crim. P.

### c.  DETECTIVE McRAE'S TESTIMONY

Lane asserts that trial counsel should have timely objected to Detective McRae's testimony "that the overflow drain on the bathtub in which Theresa Lane's body was discovered was draining properly on the day of the crime." (C. 55.)  Lane asserts that McRae's testimony was "improper lay-witness testimony." (C. 56.)

On direct appeal, this Court rejected the underlying claim, finding "no error, much less plain error," in the admission of McRae's testimony:

67

"According to Lane, Det. McRae's testimony that he thought the overflow drain was working properly constituted a lay-witness opinion that was not based on facts Det. McRae personally observed. Thus, Lane argues, Det. McRae's testimony did not comply with Rule 701, Ala. R. Evid., which provides that a lay witness's 'testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.' See also Woodward [v. State], 123 So. 3d [989,] 1023 [(Ala. Crim. App. 2011)] ('It is ... well settled that a witness can testify to his beliefs, thoughts, or impressions where he had the opportunity to observe.' (quoting Sheridan v. State, 591 So. 2d 129, 133 (Ala. Crim. App. 1991), quoting in turn Williams v. State, 375 So. 2d 1257 (Ala. Crim. App.), cert. denied, 375 So. 2d 1271 (Ala. 1979))). However, contrary to Lane's contention, Det. McRae's opinion that he thought the overflow drain was working properly was based on his personal observation that there 'was no water on the floor,' despite the facts that water was running from the bathtub faucet when Wilson discovered Theresa and that Theresa's body was almost completely submerged in water at that time. Thus, we find no error, much less plain error, in allowing Det. McRae to testify that he thought the overflow drain was working properly on the day Theresa was murdered."

Lane, 327 So. 3d at 749.

The circuit court, for the reasons this Court gave in Lane, found that the underlying claim lacked merit. The circuit court thus found that Lane was due no relief. (C. 295-96.)

On appeal, Lane continues to argue that the underlying claim has merit and thus his counsel were ineffective. Lane offers nothing that this

68

Court did not address in <u>Lane</u>. Because Lane has not shown that the underlying claim has merit, Lane is due no relief. <u>See</u> <u>Woodward</u>, <u>supra</u>.

The circuit court did not err in summarily dismissing this claim. <u>See</u> Rule 32.7(d), Ala. R. Crim. P.

### d. CHAPLAIN PIERCE'S TESTIMONY

Lane argues that his trial counsel should have timely objected to Chaplain Pierce's testimony about his conversation with Lane. Lane asserts that the testimony was privileged under Rule 505, Ala. R. Evid. (C. 58-59.)

On direct appeal, this Court rejected the underlying claim, finding "no error, much less plain error," in the admission of Pierce's testimony:

> "Pierce testified that Lane telephoned him on the day Theresa was murdered and asked if Pierce had been to Wilson's house, if anything in Wilson's house was 'out of place,' if Pierce knew the cause of Theresa's death, and if 'there was some way [Pierce] could help [Lane] get the papers to get the insurance from Wal-Mart.' Even construing the communications-to-clergy privilege in its '"broadest sense,"' <u>Tankersley v. State</u>, 724 So. 2d 557, 560 (Ala. Crim. App. 1998) (quoting Rule 505, Advisory Committee's Notes), Lane's conversation with Pierce was '"not related to religious or spiritual concerns,"' <u>Ex parte Zoghby</u>, 958 So. 2d [314,] 322 [(Ala. 2006)] (quoting <u>Nussbaumer [v. State]</u>, 882 So. 2d [1067,] 1075 [(Fla. Dist. Ct. App. 2004)]), but, rather, was clearly related to secular concerns—namely, ascertaining information about the crime and seeking assistance with a financial matter. In fact, Pierce himself testified that, when he assists people with financial

needs, 'that's secular.' (R. 1798.) Thus, Lane was not entitled to invoke the communications-to-clergy privilege '"'to enshroud conversations with wholly secular purposes solely because one of the parties to the conversation happened to be a religious minister.'"' Id. (quoting Nussbaumer, 882 So. 2d at 1075), quoting in turn People v. Carmona, 82 N.Y.2d 603, 606 N.Y.S.2d 879, 627 N.E.2d 959, 962 (1993)). Therefore, we find no error, much less plain error, in allowing Pierce's testimony."

Lane, 327 So. 3d at 756. This Court also held that, even if there were error in the admission of Pierce's testimony, that error was harmless beyond a reasonable doubt because "the most damning part of Pierce's testimony"—"that, within hours of Theresa's death, Lane sought to collect the proceeds of Theresa's life-insurance policy"—"was merely cumulative of Gabel's testimony" that Lane sought to collect those proceeds on the day of Theresa's death. Id. at 756-57.

The circuit court, for the reasons this Court gave in Lane, found that the underlying claim lacked merit. The circuit court thus found that Lane was due no relief. (C. 295-96.)

On appeal, Lane continues to argue that the underlying claim has merit and thus his counsel were ineffective. Lane offers nothing that this Court did not address in Lane. Because Lane has not shown that the underlying claim has merit, Lane is due no relief. See Woodward, supra.

The circuit court did not err in summarily dismissing this claim.

See Rule 32.7(d), Ala. R. Crim. P.

### e.  EVIDENCE ABOUT WILSON'S REPORTING THAT JEWELRY AND CASH WERE MISSING

Lane argues that his trial counsel should have timely objected to the admission of evidence about Wilson's reporting that jewelry and $3,600 were missing from her house. Lane asserts, as he did on direct appeal, that, based on collateral-estoppel principles and principles of double jeopardy, "[t]he evidence of theft was inadmissible because Mr. Lane had been acquitted of the theft in his first trial." (C. 60.)

On direct appeal, this Court rejected the underlying claim:

"At Lane's first trial, the trial court submitted three capital-murder charges to the jury—murder made capital because it was committed during a burglary, § 13A-5-40(a)(4); murder made capital because it was committed for pecuniary gain, § 13A-5-40(a)(7); and murder made capital because it was committed during a robbery, § 13A-5-40(a)(2), Ala. Code 1975. See Lane, 80 So. 3d at 283 n.2. As to the charge of capital murder-robbery, the indictment alleged that Lane intentionally caused Theresa's death while committing a theft of Wilson's property—namely, $3,600 and various items of jewelry. … As to that charge, however, the jury found Lane guilty of the lesser-included offense of murder. See Lane, 80 So. 3d at 283 n.2. According to Lane, by finding him guilty of murder instead of capital murder-robbery, the jury acquitted him of the theft of Wilson's property. Thus, Lane argues, introducing evidence of the theft of Wilson's property at Lane's second trial violated the doctrine of collateral estoppel,

71

which provides that '"'when an issue of [ultimate] fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'"' State v. Peterson, 922 So. 2d 972, 976 (Ala. Crim. App. 2005) (quoting Ex parte Howard, 710 So. 2d 460, (Ala. 1997), quoting Ashe v. Swenson, 397 U.S. 436, 443, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970)).

"The problem with Lane's argument is that, in Lane's first trial, the theft of Wilson's property was an essential element of the charge of capital murder-robbery because robbery in any degree requires proof of a theft or attempted theft. Ex parte Byner, 270 So. 3d 1162, 1167 (Ala. 2018). In Lane's second trial, however, Lane was not charged with capital murder-robbery, nor was the theft of Wilson's property an element of any of the charges for which Lane was on trial. Indeed, Lane conceded as much at trial by arguing that evidence of the theft of Wilson's property did not 'constitute relevant evidence to the proof of any elements of ... the indictment.' … Rather, count one of the indictment alleged that Lane murdered Theresa during the course of a first-degree burglary by unlawfully entering Wilson's house with the intent to commit murder or assault …, not theft. See § 13A-7-5, Ala. Code 1975 (first-degree burglary requires proof of defendant's unlawful presence in a dwelling with the intent to commit a crime therein). Similarly, count two of the indictment alleged that Lane murdered Theresa so that he could collect the proceeds of her life-insurance policy …, not that he murdered Theresa so that he could commit a theft of Wilson's property. Consistent with the indictment, the prosecutor argued during closing arguments that the State had proven Lane murdered Theresa during the course of a burglary because it had proven Lane unlawfully entered Wilson's house with the intent to murder Theresa (R. 2116, 2141-43) and argued that the State had proven Lane murdered Theresa for pecuniary gain because it had proven Lane sought to collect the proceeds of Theresa's life-insurance policy within hours after she was murdered. (R. 2144-45.)

72

Thus, unlike the jury in Lane's first trial, the jury in this case was not required to make any determination as to whether Lane was guilty of the theft of Wilson's property; that is to say, the parties were not 'relitigating' the issue of whether Lane committed the theft of Wilson's property."

Lane, 327 So. 3d at 759-60.[10]

The circuit court, for the reasons this Court gave in Lane, found that the underlying claim lacked merit. The circuit court thus found that Lane was due no relief. (C. 297-98.)

On appeal, Lane continues to argue that the underlying claim has merit and thus his counsel were ineffective. Lane offers nothing that this Court did not address in Lane. Because Lane has not shown that the underlying claim has merit, Lane is due no relief. See Woodward, supra.

The circuit court did not err in summarily dismissing this claim.

---

[10]This Court also held that, to the point Lane contended evidence of the missing property "was inadmissible because it was not relevant," any error in that regard was harmless beyond a reasonable doubt because of the overwhelming evidence of Lane's guilt and because it was "clear beyond a reasonable doubt to this Court that the jury's verdicts were based on that evidence and did not hinge on the minimal evidence of the theft of Wilson's property." Lane, 327 So. 3d at 760-61.

In his Rule 32 petition, Lane did not allege that his trial counsel were ineffective for failing make a relevancy objection to the evidence. He likewise does not address this Court's holding in Lane that any error in the admission of the evidence based on relevancy was harmless beyond a reasonable doubt.

See Rule 32.7(d), Ala. R. Crim. P.

## 6. CROSS-EXAMINATION OF JAY AT LANE'S FIRST TRIAL

Lane alleged in his petition that his replacement trial counsel were ineffective in cross-examining "witnesses, such as John Jay." (C. 64.) Lane asserted that replacement counsel should have "emphasize[d] the inconsistencies in Mr. Jay's testimony from his 2003 statement to police." (C. 63.)

In summarily dismissing this claim, the circuit court noted that Lane's argument in support of this claim turned on his contention "that his prior opportunity to cross-examine witnesses who became unavailable during his retrial should be presumed inadequate because choice-of-counsel violations are structural errors." (C. 298.) The circuit court found that the "choice-of-counsel violation … during [Lane's] first trial [did] not create an automatic assumption rendering cross-examination of witnesses deficient." (C. 299.) The circuit court also found that, because Lane was granted a new trial, the "slate was wiped clean," and thus review of his trial counsel's effectiveness was "limited to counsel's performance during his new trial." (C. 298-99.) Thus, the circuit court found that Lane was due no relief on this claim.

74

On appeal, Lane disagrees with the circuit court's finding that the "slate was wiped clean" because, he asserts,

> "this cross-examination from replacement counsel was introduced wholesale for critical witnesses. … Further, Mr. Lane's Rule 32 petition did not automatically assume there to be a violation, but instead specifically pled why the admission of infected testimony from 2006 impacted Mr. Lane's 2016 trial. Mr. Lane specifically laid out how at his 2016 trial, the State relied on the 2006 testimony of the State's only alleged eyewitness—James Jay—who said that he saw a green Ford pickup truck pull up in front of the victim's home on the morning of [Theresa's] death. … Mr. Jay's testimony from 2006 was that he could not say if the man he saw was Black or white, but that it was a small man, weighing about 120 pounds; Mr. Lane, who is white, weighed over 285 pounds.
>
> "As alleged in the petition, replacement counsel were ineffective because they failed to emphasize the inconsistencies in Mr. Jay's testimony from his 2003 statement to police (including that he said the man he saw was 'sort of dark looking' and 'might have been oriental'), and the failure by replacement counsel to question Mr. Jay about these inconsistencies was highly prejudicial to Mr. Lane."

(Lane's brief, pp. 72-73.)

For the reasons stated above, we agree with the circuit court's conclusion that the error in Lane's first trial did not create an automatic presumption that his counsel's cross-examination of witnesses in that trial was constitutionally deficient. To the point that Lane challenges his replacement counsel's effectiveness in cross-examining Jay, Lane did not

plead facts showing that counsel's performance was deficient.

> "'"[D]ecisions regarding whether and how to conduct cross-examinations and what evidence to introduce are matters of trial strategy and tactics." <u>Rose v. State</u>, 258 Ga. App. 232, 236, 573 S.E.2d 465, 469 (2002). "'"[D]ecisions whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature."'" <u>Hunt v. State</u>, 940 So. 2d 1041, 1065 (Ala. Crim. App. 2005), quoting <u>Rosario–Dominguez v. United States</u>, 353 F. Supp. 2d 500, 515 (S.D.N.Y. 2005), quoting in turn, <u>United States v. Nersesian</u>, 824 F.2d 1294, 1321 (2d Cir. 1987). "The decision whether to cross-examine a witness is [a] matter of trial strategy." <u>People v. Leeper</u>, 317 Ill. App. 3d 475, 483, 251 Ill. Dec. 202, 209, 740 N.E.2d 32, 39 (2000).'

> "<u>A.G. v. State</u>, 989 So. 2d 1167, 1173 (Ala. Crim. App. 2007). '"[T]he scope of cross-examination is grounded in trial tactics and strategy, and will rarely constitute ineffective assistance of counsel."' <u>Bonner v. State</u>, 308 Ga. App. 827, 828, 709 S.E.2d 358, 360 (2011) (quoting <u>Cooper v. State</u>, 281 Ga. 760, 762, 642 S.E.2d 817, 820 (2007))."

<u>Stanley v. State</u>, 335 So. 3d 1, 37 (Ala. Crim. App. 2020).

Replacement counsel in Lane's first trial thoroughly questioned Jay about what he saw and the circumstances around it, such as the distance from his house to where he asserted that he saw Lane. Counsel questioned Jay about Jay's size and weight and asked whether the man Jay saw "look[ed] like a 285-pound or 300-pound man," to which Jay

replied that the man did not. (Trial R. 1362-63.) At his new trial in 2016, Lane's counsel emphasized Jay's testimony that the man he saw was about Jay's size and not "a 285-pound or 300-pound man." (Trial R. 2159.)

> "Merely because counsel did not do more does not make counsel ineffective. '"The method and scope of cross-examination 'is a paradigm of the type of tactical decision that [ordinarily] cannot be challenged as evidence of ineffective assistance of counsel.'"' Davis v. State, 44 So. 3d 1118, 1135 (Ala. Crim. App. 2009) (quoting State ex rel. Daniel v. Legursky, 195 W. Va. 314, 328, 465 S.E.2d 416, 430 (1995))."

Stanley, 335 So. 3d at 39.

Besides not pleading facts showing counsel's performance was deficient, Lane made only a mere assertion that counsel's allegedly deficient performance prejudiced him. Lane is thus due no relief on this claim. See Rule 32.7(d), Ala. R. Crim. P.

### 7. FAILURE TO OBJECT TO THE TRIAL COURT'S INSTRUCTION ON CAPITAL MURDER-BURGLARY

Lane argues that his trial counsel should have objected to the trial court's instruction on the charge of capital murder-burglary. He asserts, as he did on direct appeal, that the circuit court did not instruct the jury on "three crucial elements: that that Mr. Lane acted with the intent to commit a crime, that he caused physical injury to any person who was not a participant in the crime; and that the murder took place 'during' the

77

burglary." (C. 65.)

On direct appeal, this Court rejected the underlying claim:

"In support of his claim that the trial court erroneously instructed the jury as to the charge of capital murder-burglary, Lane alleges that the trial court failed to instruct the jury that a conviction for capital murder-burglary required proof that the murder occurred during the burglary. Lane's argument is wholly without merit. The trial court began its instructions as to the charge of capital murder-burglary by instructing the jury that, to convict Lane of that charge, the jury had to find that the State had proven beyond a reasonable doubt that Lane committed 'intentional murder <u>during</u> the commission of a burglary in the first or second degree.' (R. 2236.) (Emphasis added.) The trial court then instructed the jury as to the elements of intentional murder, including the real-and-specific-intent element required for a capital-murder conviction, <u>Daniels v. State</u>, 650 So. 2d 544 (Ala. Crim. App. 1994), and the elements of first- and second-degree burglary. (R. 2236-2238.) In concluding its instructions on the charge of capital murder-burglary, the trial court stated:

"'If you find from the evidence that the State has proved beyond a reasonable doubt each of the elements of the offense of intentional murder <u>during</u> a burglary in the first or second degree, then you shall find the defendant guilty of the offense of capital murder in Count One.'

"(R. 2238.) (Emphasis added.) Thereafter, the trial court charged the jury on intentional murder as a lesser-included offense of capital murder-burglary and concluded its instructions on the intentional-murder charge as follows:

"'Bear in mind that if the defendant is guilty of intentional murder he may also be guilty of

78

capital murder if committed or coupled with additional circumstances such as I stated earlier, that the intentional murder was committed <u>during</u> the commission of a burglary first or second degree."

"(R. 2240.) (Emphasis added.)

"Contrary to Lane's contention, the trial court clearly instructed the jury that a conviction for capital murder-burglary required proof that the murder occurred during the burglary. Thus, we find no error, much less plain error, in the trial court's jury instruction."

<u>Lane</u>, 327 So. 3d at 759-60.

The circuit court, for the reasons this Court gave in <u>Lane</u>, found that the underlying claim lacked merit. The circuit court thus found that Lane was due no relief. (C. 299-300.)

On appeal, Lane continues to argue that the underlying claim has merit and thus his counsel were ineffective. Lane offers nothing that this Court did not address in <u>Lane</u>. Because Lane has not shown that the underlying claim has merit, Lane is due no relief. <u>See</u> <u>Woodward</u>, <u>supra</u>.

The circuit court did not err in summarily dismissing this claim. <u>See</u> Rule 32.7(d), Ala. R. Crim. P.

## 8. FAILURE TO OBJECT TO THE STATE'S ALLEGED VIOLATION OF <u>BATSON V. KENTUCKY</u>[11]

Lane asserts that his trial counsel were ineffective for not challenging the State's use of peremptory challenges in an allegedly discriminatory manner. In his petition, Lane raised the same underlying claims that this Court rejected on direct appeal, adding nothing new other than that his trial counsel's failure to object was ineffective assistance of counsel. (<u>Compare</u> C. 65-77 <u>with</u> Lane's brief in CR-15-1087, pp. 25-38.) On appeal, Lane generally reiterates the allegations from his petition, but he does not assert in detail his allegations about specific jurors. We thus question whether Lane has waived his claims related to specific jurors. <u>See, e.g.</u>, <u>Thompson</u>, 310 So. 3d at 887 (ineffectiveness claim was waived on appeal because appellant failed to explain how the circuit court erred when it summarily dismissed his claim). At any rate, Lane is due no relief.

On direct appeal, this Court thoroughly analyzed the substance of Lane's <u>Batson</u> claim in detail and rejected it:

"In support of his <u>Batson</u> claim, Lane alleges that the State 'used 10 of its 21 [peremptory] strikes, or 48%, against African American veniremembers, despite the fact that

---

[11]<u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).

80

African Americans represented 23% of qualified jurors. These 10 strikes resulted in the removal of 83% of qualified African Americans from the venire.' Lane's brief, at 25. According to Lane, such 'statistical evidence ... created a presumption of discrimination' against black veniremembers and 'evince[s] a "pattern of strikes" against African Americans.' Id. However, 'numbers and statistics do not, alone, establish a prima facie case of racial discrimination' in the State's use of its peremptory strikes. Petersen v. State, 326 So. 3d 535, 567 (Ala. Crim. App. 2019). Thus, the statistics Lane cites are insufficient in and of themselves to support a prima facie case of racial discrimination in the State's use of its peremptory strikes. Rather, those statistics are relevant, if at all, only when coupled with other evidence in the record that tends to indicate the State used its peremptory strikes in a racially discriminatory manner. Henderson [v. State], 248 So. 3d [992,] 1018 [(Ala. Crim. App. 2017)]. As will become clear, no such evidence exists in this case.

"To begin, Lane alleges that the Mobile County District Attorney's Office has a history of 'repeatedly remov[ing] at least 75% of African American veniremembers.' Lane's brief, at 27. However, the State contends that the prosecutor in this case, Ashley Rich, assumed office in 2011—a fact Lane does not dispute—and all but three of the cases Lane cites in support of his allegation were tried before Rich assumed office. See Dotch v. State, 67 So. 3d 936, 982 (Ala. Crim. App. 2010) (noting that 'none of the cases cited by Dotch as indicating a history of discrimination occurred within the last decade or involved the prosecutor in Dotch's case' (emphasis added)). Furthermore, as to those three cases Lane cites that were tried after Rich assumed office, this Court did not find evidence of a Batson violation in DeBlase v. State, 294 So. 3d 154 (Ala. Crim. App. 2018), and did not even address a Batson claim in Horton v. State, 217 So. 3d 27 (Ala. Crim. App. 2016), and Kennedy v. State, 186 So. 3d 507 (Ala. Crim. App. 2015). See Stanley v. State, 143 So. 3d 230, 257 (Ala. Crim. App. 2011) (noting, in rejecting appellant's claim that the Colbert

81

County District Attorney's Office has a history of gender discrimination in its jury selection, that appellant had 'not cited even a single case in which a court has found that the Colbert County District Attorney's Office has' engaged in gender discrimination). Thus, this argument does not support a prima facie case of racial discrimination in the State's use of its peremptory strikes.

"Lane also alleges that the State engaged in 'disparate treatment of members of the jury venire who were similarly situated[.]' Henderson, 248 So. 3d at 1017. Specifically, Lane notes that the State struck black veniremembers L.R., C.P., K.H., E.B., M.M., A.W., D.B., and B.P., and although the State proffered race-neutral reasons for the strikes, Lane argues that the reasons were pretextual because, he says, those black veniremembers were similarly situated to white veniremembers who were seated on the jury. To find a prima facie case of disparate treatment in the State's use of its peremptory strikes, the 'disparate treatment [must be] "obvious on the face of the record."' White [v. State], 179 So. 3d [170,] 202 [(Ala. Crim. App. 2013)] (quoting Ex parte Walker, 972 So. 2d 737, 753 (Ala. 2007)).

"As to prospective juror L.R., the State noted that it struck L.R. because he 'had only served one year in the military and he was discharged and it was honorable or dishonorable.' (R. 1397.) See State v. Heard, 917 So. 2d 658, 665 (La. Ct. App. 2005) (striking prospective juror who had dishonorable or less-than-honorable military discharge was 'a race-neutral decision to exclude anyone that may have had a problem with authority in the military'). Lane notes, however, that the State did not strike white juror S.W., who indicated that he was honorably discharged from the Navy. However, S.W. also indicated that he eventually 'went back in the Navy and finished [his] Navy career.' (R. 869-70.) Thus, L.R., who did not complete a term of military service, and S.W., who did complete a term of military service, were not so similarly situated as to support an inference of racial discrimination in

the State's use of its peremptory strikes.[11] See Wiggins v. State, 193 So. 3d 765, 790 (Ala. Crim. App. 2014) (noting that plain-error review of a Batson claim requires this Court '"to determine if, despite a similarity, there are any significant differences between the characteristics and responses of the veniremembers"' and that '"[p]otential jurors may possess the same objectionable characteristics, but in varying degrees"' (quoting, respectively, Leadon v. State, 332 S.W.3d 600, 612 (Tex. App. 2010), and Johnson v. State, 959 S.W.2d 284, 292 (Tex. App. 1997))). Furthermore, even if the failure to complete a term of military service as opposed to the completion of a term of military service is not a relevant distinction between prospective jurors, the State also struck L.R. because he 'was a caretaker for his brother in their family home' (R. 1396), which was a characteristic not applicable to S.W. and is a valid race-neutral reason for striking a prospective juror. Jackson v. State, 791 So. 2d 979, 1007 (Ala. Crim. App. 2000). In addition, we note that L.R. did not indicate on his juror questionnaire whether he was in favor of the death penalty (R. 597), and during individual voir dire L.R. indicated that he did not 'really have an opinion one way or the other' on the death penalty (R. 597) and that he had not 'thought about the death penalty prior to [being selected] for jury service.' (R. 601.) S.W., on the other hand, indicated that he was 'in favor of' the death penalty. (R. 863.) See People v. Mai, 57 Cal. 4th 986, 161 Cal. Rptr. 3d 1, 305 P.3d 1175, 1222 (2013) (peremptory strike against prospective juror was race-neutral, despite the fact that both prospective juror and seated juror expressed ability to vote for death penalty, where seated juror 'expressed much stronger views in favor of the death penalty'). Thus, because the State struck L.R. for valid race-neutral reasons that did not apply to S.W., 'disparate treatment is not "obvious on the face of the record,"' White, 179 So. 3d at 202 (quoting Ex parte Walker, 972 So. 2d at 753), by virtue of the fact that the State struck L.R. but did not strike S.W.

"As to prospective juror C.P., the State noted that it

struck C.P. because he indicated that he believed he had been wrongfully arrested in the past. See United States v. Brown, 809 F.3d 371 (7th Cir. 2016) (prospective juror's belief that he had been wrongfully arrested was race-neutral reason for peremptory strike). Lane notes, however, that the State did not strike white juror S.W., who, according to Lane, also indicated that he had been wrongfully arrested. However, contrary to Lane's allegation, S.W. did not indicate that he had been wrongfully arrested but, rather, stated that his case had been dismissed after he had completed 20 hours of community service. (R. 867.) In fact, S.W. indicated that he believed he had been treated fairly during his case and that he had 'no issue with the process that [he] went through.' (R. 867.) Thus, C.P., who believed that he had been wrongfully arrested, and S.W., who did not express such a belief, were not similarly situated. See Brown, 809 F.3d at 375 ('[T]he jurors that Brown points to were not similarly situated to Juror 74. With regard to Juror 81, having charges dropped is distinguishable from being wrongly arrested. ... As for Juror 3, being charged and convicted is readily distinguishable from being wrongly arrested.'). In addition, the State notes that it also struck three white veniremembers who indicated that members of their families had been wrongfully arrested or convicted (R. 1387, 1389, 1392), which tends to indicate that striking C.P. did not constitute disparate treatment of black and white veniremembers by the State but, rather, was consistent with the State's attempt to strike any veniremembers, regardless of their race, who had had potentially negative experiences with law enforcement. See Whatley v. State, 146 So. 3d 437, 455 (Ala. Crim. App. 2010) ('"'Where whites and blacks are struck for the same reason, there is no evidence of disparate treatment.'"' (quoting Bush v. State, 695 So. 2d 70, 100 (Ala. Crim. App. 1995), affirmed, 695 So. 2d 138 (Ala.), cert. denied, Bush v. Alabama, 522 U.S. 969, 118 S. Ct. 418, 139 L. Ed. 2d 320 (1997), quoting in turn Carrington v. State, 608 So. 2d 447, 449 (Ala. Crim. App. 1992))). Thus, for the foregoing reasons, 'disparate treatment is not "obvious on the face of the record,"' White, 179 So. 3d at

84

202 (quoting <u>Ex parte Walker</u>, 972 at 753), by virtue of the fact that the State struck C.P. but did not strike S.W.

"As to prospective juror K.H., the State noted that it struck K.H. because her boyfriend had once worked as a law enforcement officer but had quit after deciding that 'law enforcement was not for him.' (R. 1383.) Lane notes, however, that the State did not strike white juror S.W., who also indicated that he had worked as a law enforcement officer for a brief period before deciding that 'it wasn't for [him].' (R. 869.) However, the State struck K.H. for multiple race-neutral reasons that were not applicable to S.W., including that K.H. 'did not believe in the death penalty and ... did not feel it was her right to determine if someone lives or dies' (R. 1382) and that she 'had an uncle that was guilty of theft [and] another uncle that was guilty of assault.' (R. 1382-83.) <u>See</u> <u>Gobble [v. State]</u>, 104 So. 3d [920,] 949 [(Ala. Crim. App. 2010)] (noting that '"[t]he peremptory strike of a prospective juror who had expressed reservations about the death penalty [is] sufficiently race-neutral so as to not violate <u>Batson</u>"' and that '"[s]triking a prospective juror because a member of the juror's family has been convicted of a crime is a valid race-neutral reason under <u>Batson</u>"' (quoting, respectively, <u>Acklin v. State</u>, 790 So. 2d 975, 988 (Ala. Crim. App. 2000), and <u>Lewis v. State</u>, 741 So. 2d 452, 456 (Ala. Crim. App. 1999))). This Court has previously held that

"'merely because [a prospective juror and a seated juror] shared one commonality ... does not make those jurors similarly situated and does not establish disparate treatment on the part of the State. "Where multiple reasons lead to a peremptory strike, the fact that other jurors may have some of the individual characteristics of the challenged juror does not demonstrate that the reasons assigned are pretextual."'

"<u>DeBlase</u>, 294 So. 3d at 203 (quoting <u>Luong v. State</u>, 199 So.

85

3d 173, 191 (Ala. Crim. App. 2015)). See also Wiggins, 193 So. 3d at 790 ('"The fact that jurors remaining on the panel possess one [or] more of the same characteristics as a juror that was stricken[] does not establish disparate treatment."' (quoting Barnes v. State, 855 S.W.2d 173, 174 (Tex. App. 1993))). Thus, because K.H. and S.W. shared one common characteristic but were also different in meaningful ways, 'disparate treatment is not "obvious on the face of the record,"' White, 179 So. 3d at 202 (quoting Ex parte Walker, 972 So. 2d at 753), by virtue of the fact that the State struck K.H. but did not strike S.W.

"In further support of the State's allegedly disparate treatment of similarly situated black and white veniremembers, Lane notes that the State struck black veniremembers K.H., E.B., M.M., A.W., D.B., and B.P. because they or members of their families had 'contact with the criminal justice system' but 'ignor[ed] similar involvement among four seated white jurors.' Lane's brief, at 37. However, as noted, 'merely because [prospective jurors and seated jurors] shared one commonality ... does not make those jurors similarly situated and does not establish disparate treatment on the part of the State. DeBlase, 294 So. 3d at 203. Rather, plain-error review of a Batson claim requires this Court to '"look to the entire record to determine if, despite a similarity, there are any significant differences between the characteristics and responses of the veniremembers that would, under the facts of this case, justify the prosecutor treating them differently as potential members of the jury."' Wiggins, 193 So. 3d at 790 (quoting Leadon, 332 S.W.3d at 612).

"Here, in addition to 'contact with the criminal justice system,' the State provided additional race-neutral reasons for striking K.H., E.B., M.M., A.W., D.B., and B.P. As noted, the State struck K.H. because she 'did not believe in the death penalty and ... did not feel it was her right to determine if someone lives or dies.' See Gobble, supra. The State struck

E.B. because 'she put on her death penalty question it has to be guilty beyond a shadow of a doubt.' (R. 1394.) See Whatley v. State, 146 So. 3d 437, 456 (Ala. Crim. App. 2010) ('"[T]he fact that a veniremember would hold the State to a higher burden of proof is a race-neutral reason for striking that veniremember."' (quoting Blanton v. State, 886 So. 2d 850, 874 (Ala. Crim. App. 2003), cert. denied, 886 So. 2d 886 (Ala. 2004), cert. denied, Blanton v. Alabama, 543 U.S. 878, 125 S. Ct. 119, 160 L. Ed. 2d 131 (2004))). The State struck M.M. not simply because she had had 'contact with the criminal justice system' but because she failed to disclose her prior theft conviction and because she knew one of the State's witnesses. See Sharp v. State, 151 So. 3d 342, 368 (Ala. Crim. App. 2010) (prior conviction is race-neutral reason for peremptory strike and prospective jurors who failed to disclose prior convictions were not similarly situated to seated juror who did disclose prior conviction); and Creque v. State, 272 So. 3d 659, 709 (Ala. Crim. App. 2018) (fact that prospective juror knew potential witness was race-neutral reason for strike). The State struck A.W. because 'she used to not believe in the death penalty ... when she was younger but now ... she does.' (R. 1388.) See State v. Wilson, 938 So. 2d 1111, 1135 (La. Ct. App. 2006) (no error by trial court in accepting State's peremptory strike of juror who indicated that she did not believe in the death penalty in the past but had changed her opinion). The State struck D.B. because she also once 'didn't believe in [the death penalty] and then she changed her mind' (R. 1386) and because she believed the evidence 'had to be without a doubt.' (R. 1387.) See Wilson, supra, and Whatley, supra. The State struck B.P. not simply because her brother had had 'contact with the criminal justice system' but because she believed her brother had been wrongfully convicted of murder and because she suffered from back pain, hypertension, and diabetes.[12] See Wilburn v. Commonwealth, 312 S.W.3d 321, 331 (Ky. 2010) (prospective juror's belief that friend had been wrongfully arrested was race-neutral reason for peremptory strike); and Scott v. State, 240 Ga. App. 50, 522 S.E.2d 535, 538 (1999) (peremptory strike based on prospective juror's health was

racially neutral on its face).[13]

"None of the four white jurors Lane identifies had characteristics similar to the additional characteristics that caused the State to strike K.H., E.B., M.M., A.W., D.B., and B.P., which, as noted, were valid race-neutral reasons for peremptory strikes. Thus, although the four white jurors Lane identifies shared a single common characteristic with K.H., E.B., M.M., A.W., D.B., and B.P., 'disparate treatment is not "obvious on the face of the record,"' White, 179 So. 3d at 202 (quoting Ex parte Walker, 972 So. 2d at 753), by virtue of the fact that the State struck K.H., E.B., M.M., A.W., D.B., and B.P. because there were meaningful differences between those prospective jurors and the white jurors Lane identifies. DeBlase, supra; Wiggins, supra.

"Based on the foregoing and our review of the entire voir dire process, we conclude that the record does not support a prima facie case of 'purposeful discrimination by the State in the exercise of its peremptory challenges.' Henderson, 248 So. 3d at 1016. Thus, we find no plain error with respect to Lane's Batson claim, and, in the absence of such error, Lane is not entitled to relief on this claim. See Gobble, 104 So. 3d at 949 ('There is nothing to establish a prima facie case of [racial] discrimination. Accordingly, we find no plain error.').

"_____

"[11]Lane also contends that white veniremember C.S. served in the military and notes that the State did not strike C.S. from the jury. However, there is no indication in the record, or allegation from Lane, that C.S. failed to complete a term of military service.

"[12]Lane argues that B.P.'s health was a pretextual reason for striking her because the State did not strike white juror B.T., who disclosed that he suffers from diabetes. However, as noted, the State also struck B.P. because she

believed her brother had been wrongfully convicted—a characteristic not applicable to B.T.

"[13]This Court has reviewed the entirety of the voir dire examination, and the State's reasons for striking K.H., E.B., M.M., A.W., D.B., and B.P. are supported by those prospective jurors' responses."

Lane, 327 So. 3d at 729-34. As that analysis shows, Lane's Batson claim lacks merit.

The circuit court likewise analyzed Lane's ineffectiveness claim in detail. On appeal, Lane continues to argue that the underlying claim has merit and thus his counsel were ineffective. Lane offers nothing that this Court did not address in Lane. Because Lane has not shown that the underlying claim has merit, Lane is due no relief. See Woodward, supra.

The circuit court did not err in summarily dismissing this claim. See Rule 32.7(d), Ala. R. Crim. P.

## B. PENALTY-PHASE CLAIMS

At the penalty phase, Lane presented testimony from William Dixon and William Nicholas, who had both worked in prison ministries and knew Lane.[12] Lane also presented extensive testimony from Dr.

---

[12]Testimony from Dixon and Nicholas from Lane's first trial was read into the record because they were unavailable for the second trial.

Marianne Rosenzweig, a forensic psychologist and mitigation specialist. Dr. Rosenzweig testified that she interviewed and evaluated Lane; reviewed records about Lane, his family, and the case; and interviewed Geraldine Ulich, Jean Wahl, Rene Stiegler, Harold Fink, Nancy Pisarik, Robert Lane, Carol Lane, and Joan Hutchinson. (Trial R. 2326-32.) Dr. Rosenzweig also testified that "[t]here were a lot" of other persons she wanted to interview but could not because they were deceased, she or an investigator she hired could not find them, they did not return her messages, or they refused to talk to her.

Lane argues that his trial counsel were ineffective during the penalty phase when counsel failed to (1) investigate, obtain, and present additional "readily available" mitigation evidence; (2) object to testimony from Dr. Karl Kirkland; and (3) object to the trial court's jury instruction on its verdict. (Lane's brief, pp. 82-93.)

## 1. MITIGATION EVIDENCE

Lane asserts that his trial

"counsel were ineffective for failing to investigate and present the jury with readily-available mitigating evidence at the penalty phase. (C. 79.) Trial counsel presented just three witnesses—a mitigation specialist and two prison ministers— none of whom could testify personally to Mr. Lane's traumatic childhood. (C. 79.) Therefore, while counsel presented a

limited family history through the testimony of the mitigation specialist, the defense failed to fully investigate and present evidence and testimony of positive character traits and family history—thereby depriving the jury of critical mitigating evidence. (C. 79.)"

(Lane's brief, pp. 84-85.) In his petition, Lane asserted that trial counsel were ineffective for relying on Dr. Rosenzweig and that trial counsel should have independently investigated mitigation evidence, interviewed witnesses, and presented specific witnesses at trial.

Lane alleged that trial counsel should have called Rene Stiegler, who had testified in the penalty phase of the first trial and who was interviewed by Dr. Rosenzweig. Lane asserts on appeal:

"Had trial counsel met with and elicited testimony from Rene Stiegler, the jury would have learned that Mr. Stiegler was a friend and colleague of Mr. Lane. Mr. Stiegler would have testified that Mr. Lane was always doing favors for other people and was a good friend. Mr. Stiegler would have described to the jury that Mr. Lane threw a big birthday party for Theresa that he planned for extensively.[13] Mr. Stiegler

_____

[13]At the first trial, Stiegler testified about the birthday party:

"My experiences with him—like I said, as much as he would screw up you still couldn't help but like the guy. He always seemed to have good intentions that just went wrong.

"… I knew his wife Theresa and she was a little sweetheart. And [Lane] wanted to have this birthday party for her. I don't remember why but it was a special—maybe it was like a 30th birthday or something. But it was some

was called to testify at the 2006 penalty phase of Mr. Lane's first trial, when Mr. Lane received an 8-4 verdict for life without parole instead of a death sentence, but trial counsel failed to call him to testify at the second trial. This failure was prejudicial, as it deprived the jury from hearing any witness testify about having a relationship with Mr. Lane before Ms. Lane's death."

(Lane's brief, pp. 85-86 (citations omitted).) Lane also asserts on appeal that counsel should have interviewed and called these witnesses to testify:

- "Robert Lane: Robert Lane would have explained that Mr. Lane's parents divorced when he was just one year old and

---

milestone birthday. It was a special deal. He called me. He says I'm planning this big party for Theresa and doing all this stuff and inviting all of her friends and everything. I want to hire a male stripper. And I said, Tom, I don't know that that's a good idea. He said, no, no. He says I think this will really surprise her. I mean, he just was hell fire bent on hiring this dancer. And he asked me to come. So I said okay I will come by because I like Theresa, very sweet, hardworking girl. And I go by there and this dancer is dressed up like a policeman. And he comes in and he handcuffs Theresa and she is embarrassed. And she's totally embarrassed and then he starts doing his dance and even the dancer could sense how embarrassed she was. And he really toned down his routine so to speak. And Tom had asked me to videotape this and I was videotaping it and I felt very, very embarrassed for Theresa because I could tell she was really uncomfortable with it. But Tom, in his mind, he felt this was a wonderful thing that he was really doing something for Theresa. It's just another example of things gone wrong."

(Record in CR-05-1443, R. 1274-76.)

that Mr. Lane's mother was known in the community for alcoholism and infidelity. Mr. Lane would have told counsel that Mr. Lane's mother was a heavy drinker and drank every day of the week. Mr. Lane would have also told counsel that when he would pick Mr. Lane up from his mother's house when Mr. Lane was a child, Mr. Lane would frequently be dirty and have a soiled diaper."

- "Randy King: Mr. King would have described Mr. Lane's mother as violent, and would have detailed an incident when she punched a man at a bar and knocked him out with one punch."

- "Carol Lane: Carol Lane would have told counsel that Mr. Lane's mother was known to be violent with her own father, and that she acted very 'mean' and 'crazy' towards Mr. Lane. She would have told counsel that Mr. Lane's mother beat him with belts frequently, and that she herself observed red welts on Mr. Lane. Carol would have also recounted that when Mr. Lane was four years old his mom went into a bar and left Mr. Lane in the car in the parking lot for multiple hours."

(Lane's brief, pp. 86-87 (citations omitted).)

The circuit court correctly summarily dismissed this claim as insufficiently pleaded and lacking merit. (C. 305-07.) As the circuit court found, "'"'[C]ounsel is not required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy.'"'" McWhorter v. State, 142 So. 3d 1195, 1246 (Ala. Crim. App. 2011) (citations omitted). And as for Lane's claim that his counsel were ineffective for relying on Dr. Rosenzweig to

93

investigate and interview witnesses, this Court has held:

"To the extent that this claim of ineffective assistance of counsel is premised on counsel's hiring other people to conduct the mitigation investigation instead of conducting the investigation themselves, this Court has rejected such a claim:

"'The appellant appears to argue that counsel could not delegate the responsibility to investigate to a subordinate. We disagree.

"'"[I]t is neither unprofessional nor unreasonable for a lawyer to use surrogates to investigate and interview potential witnesses rather than doing so personally. See Harris v. Dugger, 874 F.2d 756, 762 & n.8 (11th Cir. 1989). In fact, we have criticized counsel in other cases for failing to utilize subordinates to conduct pre-trial investigation. See Henderson v. Sargent, 926 F.2d 706, 714 (8th Cir. 1991)."

"'Walls v. Bowersox, 151 F.3d 827, 834 n.4 (8th Cir. 1998). See also Callahan v. State, 24 S.W.3d 483, 486 (Tex. Ct. App. 2000) (holding that "[a] defense attorney is not required to investigate the facts of a case personally. Counsel may delegate the investigation to a private investigator"). Finally, when discussing the duty to investigate mitigating evidence in Rompilla[ v. Beard, 545 U.S. 374 (2005)], Wiggins [v. Smith, 539 U.S. 510 (2003)], and Williams [v. Taylor, 529 U.S. 362 (2000)], the Supreme Court did not expressly or impliedly hold that counsel must perform the actual investigation. Therefore, we conclude that

94

> the appellant's trial attorneys did not render ineffective assistance when they relied on subordinates to conduct most of the mitigation investigation, communicated with them during the investigation, and made the ultimate decision about what mitigation evidence to present.'

"Hall v. State, 979 So. 2d 125, 163 (Ala. Crim. App. 2007)."

Mashburn, 148 So. 3d at 1140. Lane has not pleaded facts showing that trial counsel performed deficiently by relying on Dr. Rosenzweig.

Finally, as the circuit court also found, Dr. Rosenzweig testified about the same evidence that Lane asserts counsel should have presented from different witnesses. Thus, testimony from those witnesses would have been cumulative. See, e.g., Stallworth, 171 So. 3d at 74.

Lane is due no relief on this claim, and the circuit court did not err in summarily dismissing it. See Rule 32.7(d), Ala. R. Crim. P.

## 2. DR. KIRKLAND'S TESTIMONY

On direct appeal, Lane challenged the admission during the penalty phase of testimony from "Dr. Kirk Kirkland, a court-appointed forensic psychologist who, before trial, had evaluated Lane's competency to stand trial and his mental condition at the time of the offense." Lane, 327 So. 3d at 773. Lane's trial counsel did not object to the testimony, and this Court thus reviewed the issue for plain error:

95

"At the sentencing hearing, Lane presented the testimony of Dr. Marianne Rosenzweig, a forensic psychologist who interviewed people familiar with Lane and who conducted a mental evaluation of Lane, including the administration of the Rorschach inkblot test, which, according to Dr. Rosenzweig, 'gives ... insight into how people typically think, their feelings, how they defend themselves psychologically.' (R. 2413.) Based on the data she collected, Dr. Rosenzweig diagnosed Lane with 'narcissism' (R. 2418) and 'antisocial personality disorder' (R. 2419), which, Dr. Rosenzweig testified, resulted from Lane's experiences with 'abuse or neglect, unstable parenting, or inconsistent discipline in childhood'; '[p]arental rejection, disapproval, or hostility'; '[e]xposure to personal cruelty and domination' from his mother; and 'low socioeconomic status.' (R. 2421.) Based on her diagnoses, when asked if there was 'anything in [her] evaluation ... which may explain why' Lane murdered Theresa (R. 2425), Dr. Rosenzweig testified that Lane 'seems to be lacking in the ability to empathize with other people, and that would include Theresa. And in the circumstance where she was leaving him, he could only focus on himself and his own needs ... in that situation.' (R. 2426.) Dr. Rosenzweig also testified that the actions of a person who is 'fueled by a personality disorder' can often be 'impulsive' and that 'the history [she] got indicates that [Lane] acts on impulse.' (R. 2452.) However, Dr. Rosenzweig also testified that the difference between acting impulsively and acting by 'conscious choice' is not 'black and white' (R. 2452), that 'to some extent [actions are] choice' (R. 2452), and that she was not suggesting that Lane did not have the capacity to 'appreciate the nature and wrongfulness of his actions.' (R. 2457-58.)

"On rebuttal, Dr. Kirkland testified that, in addition to evaluating Lane, he had reviewed Dr. Rosenzweig's data and that '[his] feeling was ... pretty much like [Dr. Rosenzweig] testified. She said there were multiple features of both antisocial and narcissistic personality there.' (R. 2495.) Dr.

Kirkland also confirmed that he 'personally went over Dr. Rosenzweig's test results' (R. 2495), that he 'went back and scored [Lane's Rorschach test] and it came out the same way' (R. 2495), and that he 'didn't find a lot to disagree with about [Dr. Rosenzweig's] interpretation of the test anyway.' (R. 2496.) In addition, Dr. Kirkland testified that

> "'part of the features of both antisocial and narcissism is that the person ... has trouble with empathy.

> "'The—what that means is that they're focused so much on their needs and perceptions that they have a hard time regarding other people as other people. Sometimes they're seen as objects or, worse, even pawns. And there was certainly some evidence of that in the history and in the testing.'

"(R. 2498-99.) Although Dr. Kirkland conceded that the actions of a person suffering with narcissism and antisocial personality disorder can be influenced by the person's background, he testified that 'often the deciding factor is individual choice.' (R. 2498.) On cross-examination, Dr. Kirkland testified as follows:

> "'Q .... [Y]ou were asked to be here to review Dr. Rosenzweig's testimony and for whatever reason that the State wanted you to testify regarding her findings. Is that true?

> "'A. Correct.

> "'Q. Okay. And you don't have any great disagreement with Dr. Rosenzweig regarding either her socioeconomic investigation, psychosocial investigation, what we call a mitigation investigation?

97

"'A. Right. In looking at the testing that she did and ... the conclusions that she drew from that, I think we came to the same diagnosis.'

"(R. 2500-01.)

"On appeal, Lane asserts multiple grounds in support of his claim that the trial court erred by admitting Dr. Kirkland's testimony. We need not address those arguments, however, because even if Dr. Kirkland's testimony was inadmissible—an assumption we do not make—we conclude beyond a reasonable doubt that Lane was not prejudiced by the testimony and that any error in admitting the testimony was therefore harmless. Rule 45, Ala. R. App. P.

"Dr. Kirkland's brief testimony was essentially entirely consistent with Dr. Rosenzweig's extensive testimony. In fact, Dr. Kirkland confirmed that he 'came to the same diagnosis' as that of Dr. Rosenzweig and that he 'didn't find a lot to disagree with' in Dr. Rosenzweig's testimony. Although Lane makes much of the fact that Dr. Kirkland emphasized the 'individual choice' aspect of Lane's actions, Dr. Rosenzweig also testified that Lane's actions were, to some extent, the result of his 'conscious choice.' Thus, as the State notes, the difference between Dr. Rosenzweig's testimony and Dr. Kirkland's testimony on that issue 'was one of degree, not kind.' State's brief, at 79. In addition, the trial court apparently found Dr. Rosenzweig's testimony on that issue to be more persuasive, as evidenced by the fact that the trial court found the existence of, and gave weight to, the statutory mitigating circumstance that Theresa's murder was committed 'under the influence of extreme mental or emotional disturbance.' § 13A-5-51(2), Ala. Code 1975. (C. 97.) Although the trial court relied on Dr. Kirkland's testimony in finding that there was no evidence indicating that Lane lacked the capacity to appreciate the criminality of his conduct, § 13A-5-51(6), Ala. Code 1975, the trial court correctly noted that both Dr. Rosenzweig and Dr. Kirkland

98

testified that Lane's narcissism and antisocial personality disorder did not result in diminished capacity. (C. 98-99.)

"Given the foregoing, there is absolutely no basis for concluding that Lane would have received a different sentence in the absence of Dr. Kirkland's testimony, which was almost wholly harmonious with Dr. Rosenzweig's testimony. Moreover, we reiterate that Lane's failure to object to Dr. Kirkland's testimony weighs against a finding that Lane was prejudiced by such evidence. Towles [v. State, 263 So. 3d 1076 (Ala. Crim. App. 2018)]. Therefore, we conclude beyond a reasonable doubt that any error in the admission of Dr. Kirkland's testimony was harmless and does not entitle Lane to relief. See Broadnax [v. State], 825 So. 2d [134,] 216 [(Ala. Crim. App. 2000)] ('The purpose of the harmless error rule is to avoid setting aside a sentence for defects the correction of which would have little, if any, likelihood of changing the result of sentencing.')."

Lane, 327 So. 3d at 773-75.

In his petition, Lane alleged that his counsel were ineffective for not objecting to Dr. Kirkland's testimony. In support, Lane made the same substantive arguments that he made on direct appeal.

On appeal, Lane continues to argue that the underlying claim has merit and thus his counsel were ineffective. Lane offers nothing to justify a different conclusion than this Court reached in Lane. Thus, Lane is due no relief. See Woodward, supra.

### 3.  PENALTY-PHASE JURY INSTRUCTIONS

Lane alleged that his trial counsel were ineffective by not objecting

"when the trial court instructed the jury to return a verdict of life without parole if the mitigating circumstances outweighed the aggravating circumstances, but failed to also instruct the jury to return a verdict of life without parole if the circumstances were of equal weight." (Lane's brief, pp. 91-92.) On direct appeal, this Court rejected the underlying claim, finding that the record refuted it:

> "[C]ontrary to Lane's allegation, the trial court expressly instructed the jury that it should recommend a life-imprisonment-without-parole sentence if it found that the mitigating circumstances 'outweigh[ed] [the aggravating circumstances] <u>or [were] equal to</u>' the aggravating circumstances. (R. 2519.) (Emphasis added.) Thus, we find no error, much less plain error, in the trial court's jury instructions regarding the weighing of aggravating and mitigating circumstances. Accordingly, Lane is not entitled to relief on this claim."

<u>Lane</u>, 327 So. 3d at 775. Thus, because the record refutes the claim underlying Lane's assertion that counsel were ineffective, he is due no relief. <u>See</u> <u>Woodward</u>, <u>supra</u>.

Lane also asserted that "trial counsel failed to object when the trial court erroneously determined that death was the appropriate sentence in this case because nothing Mr. Lane 'presented in mitigation outweigh[ed] his responsibility for the choices he made in his conscious decision to take the life of Theresa Lane.'" (Lane's brief, p. 92 (quoting the trial court's

sentencing order).) Lane makes no argument and cites no authority in support of this claim. See Rule 28(a)(10), Ala. R. App. P. Regardless, the trial court's order shows that it correctly applied the law in sentencing Lane. (See, e.g., Trial C. 100 ("This Court agrees with the jury's finding beyond a reasonable doubt that the aggravating circumstances exist and that they outweigh the mitigating circumstances.").)

Lane is due no relief on this claim. See Rule 32.7(d), Ala. R. Crim. P.

## IV. CLAIM THAT THE STATE WITHHELD EXCULPATORY EVIDENCE

Lane asserts that "the State withheld evidence indicating that there was no forced entry through the front door of Ms. Wilson's home on October 12—the day of Ms. Lane's death." (Lane's brief, p. 94.) Among other reasons, the circuit court summarily dismissed this claim as insufficiently pleaded because it was based on speculation. The circuit court properly dismissed it on that basis.

Lane did not plead that any exculpatory evidence actually exists—only that, "[u]pon information and belief, the State withheld" exculpatory evidence. That does not satisfy his burden of pleading under Rule 32. See, e.g., Brooks, 340 So. 3d at 474 ("Here, Brooks's claim failed to set out a

101

full factual basis of a <u>Brady [v. Maryland</u>, 373 U.S. 83 (1963),] violation in at least two ways. First, Brooks did not allege that the State actually withheld or suppressed any evidence. Rather, the information Brooks cites as a basis for his <u>Brady</u> claim—that the State declined to prosecute two witnesses in exchange for their trial testimony—was qualified by the phrase 'upon information and belief.' In other words, Brooks alleged that he believed that the State had withheld or suppressed certain evidence— not that it did in fact do so. <u>See generally</u> <u>Government Street Lumber Co. v. AmSouth Bank, N.A.</u>, 553 So. 2d 68, 77-78 (Ala. 1989) ('Speculation and subjective beliefs are not the equivalent of personal knowledge and do not satisfy the requirement of Rule 56(e), [Ala.] R. Civ. P. ... Moreover, matters based upon information and belief are essentially hearsay and thus are insufficient to support a motion for summary judgment.' (citations omitted)). In short, alleging 'upon information and belief' that something happened is nothing more than a speculative assertion, and '[s]peculation is not sufficient to satisfy a Rule 32 petitioner's burden of pleading.' <u>Mashburn v. State</u>, 148 So. 3d 1094, 1125 (Ala. Crim. App. 2013).").

The circuit court properly dismissed this claim. <u>See</u> Rule 32.7(d),

Ala. R. Crim. P.

## CONCLUSION

The judgment of the circuit court is affirmed.

AFFIRMED.

McCool and Cole, JJ., concur. Kellum, J., concurs in part and concurs in the result in part, with opinion. Windom, P.J., recuses herself.

KELLUM, Judge, concurring in part and concurring the result.

I concur in all parts of the main opinion except Part III.A.5.a. As to Part III.A.5.a, I concur only in the result.